**PONTARELLI LIMOUSINE, INC.; Metropolitan Limousine, Inc.; Sal Salerno d/b/a Salerno Limousine; Salerno Limousine Service, Inc.; Class A Limousine Service, Inc.; Roberta Hensen d/b/a Executive Limousine; R & R Limousine Service, Inc.; and Sullivan & Son, Inc., Plaintiffs,**

v.

**The CITY OF CHICAGO, a municipal corporation; Theodore Kapsalis; Patrick Dunne; O'Hare–Midway Limousine Service, Inc.; Amm's Limousine Service, Inc.; American Airport Service Limousine Corporation, Inc.; A–1 Airport Limousine Service, Inc.; Henry Pepper d/b/a H & M Limousine Service; Better Service Cadillac Limousine, Inc.; Arlington Heights Limousine, Inc.; Executive Chauffering and Airport Service II; Blue Line Transportation Service—Jim's Livery; Midwest Livery Association, Inc.; and Northern Illinois Livery Owners Association, Defendants.**

No. 83 C 6716.

United States District Court,
N.D. Illinois, E.D.

Jan. 11, 1989.

See also 652 F.Supp. 1428.

Charles Pressman, Bertrand A. Rice, Charles Pressman, P.C., Chicago, Ill., for plaintiffs.

Dan Brusslan, Fischel & Kahn, Ltd., Gordon B. Nash, Deborah H. Bornstein, Gardner, Carton & Douglas, Robert J. Dargis, Asst. Corp. Counsel, William Carlisle Herbert, Hopkins & Sutter, Michael A. Abramson, Johnson & Drozdzik, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

This case involves a plan implemented by the City of Chicago ("the City") in 1975 to deal with traffic congestion at O'Hare International Airport ("O'Hare"). The plaintiffs are ten livery companies with City livery licenses. The defendants are the City of Chicago as well as a number of livery companies not licensed by the City, two city-licensed livery companies affiliated

with non-city-licensed livery companies, and an unincorporated organization of non-city-licensed livery companies. (All non-city defendants are referred to collectively as "the suburban livery companies").

Count I names the City alone and alleges violations of the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Count II names all defendants and alleges a conspiracy to violate the plaintiffs' due process and equal protection rights. Both counts arise under 42 U.S.C. § 1983.[1] Currently pending are motions for summary judgment by all parties,[2] as well as a motion in limine by the City to prevent the plaintiffs from asserting a theory of damages not raised until nearly four years into the lawsuit.[3] The court will deal with the motions in turn.

### I.

Because both the plaintiffs and the defendants have moved for summary judgment, setting forth a statement of facts for these motions presents a somewhat trickier task than in a typical summary judgment ruling. Ordinarily, of course, "all factual inference are to be taken against the moving party and in favor of the opposing party." *Shlay v. Montgomery*, 802 F.2d 918, 920 (7th Cir.1986) (quoting *International Administrators, Inc. v. Life Insurance Co. of North America*, 753 F.2d 1373, 1378 (7th Cir.1985)). Because both sides here have moved, however, the court must draw the inferences differently on any genuine issues of fact that exist. As it turns out, the underlying facts in this case are not in dispute; the appropriate inferences to be drawn from these facts will be ad-

---

1. The complaint originally contained anti-trust claims as well, but the plaintiffs have voluntarily dismissed them.

2. There are five separate motions for summary judgment or partial summary judgment: The plaintiffs' motions for partial summary judgment on Count I (based on collateral estoppel) and for partial summary judgment on Count I (not based on collateral estoppel); the City's motion for summary judgment on Counts I and II; Defendant American Airport Limousine Corporation's ("AALC's") motion for summary judg-

ment on Count II; and the remaining defendants' motion for summary judgment on Count II. Since the latter two motions substantially overlap, this court will refer to them collectively as a single motion.

3. Also pending are a motion by the City for judgment on the pleadings and a motion in limine by the plaintiffs for collateral estoppel against the City. Because the issues raised in these motions arise again in the motions for summary judgment, these motions are moot.

dressed in the discussions of the various motions.

A livery is a public passenger vehicle, usually a limousine, in which a passenger agrees in advance to pay a specified amount for ground transportation to a destination of the passenger's choice. Liveries differ from taxicabs in that livery fares are not determined by taximeters measuring distance and time. And they differ from buses in that they do not follow specified routes.

The City issues a limited number of licenses for livery vehicles. An applicant for a City license must meet certain requirements, such as residency within City limits and a reputation for financial responsibility. A City licenseholder must pay an annual fee of $100 per year.

Under City law, only livery vehicles with City livery licenses ("city liveries") may transport passengers between two locations within the City. All other livery vehicles—that is, those with only state livery licenses ("suburban liveries")—may transport passengers into and out of the City, but not between two City locations. O'Hare Airport is within the City, so it is unlawful for a livery vehicle that is not licensed by the City to transport passengers from O'Hare to downtown Chicago. Any livery vehicle, however, may pick-up a passenger at O'Hare and transport him to the suburbs.

Travelers arriving at O'Hare acquire livery service in two ways. Some passengers, referred to herein as "reserved passengers," make reservations in advance and meet their liveries when their flights arrive. Others—so-called "walk-up passengers"—choose livery service only after they arrive at the airport, and must then seek out available liveries willing and able to transport them to their destinations.

City law has long made it unlawful for livery drivers to solicit business within the terminals at O'Hare. This law is designed, at least in part, to avoid the traffic congestion caused by livery vehicles parking for long periods of time at the curbside outside the terminals while their owners solicit walk-up passengers within the terminals.

The law also prevents the harrassment of travelers arriving at O'Hare.

In the early 1970's, livery drivers were permitted to park outside the terminals and leave their cars unattended while they went inside to find reserved passengers and help them with their bags. Livery drivers not meeting reserved passengers could also stop outside the terminals, but they had to remain with their vehicles and wait for walk-up passengers leaving the terminals in search of livery service.

In 1973 the City determined that traffic congestion had become a major problem at O'Hare, and that the growing number of livery vehicles parking outside the terminals was a substantial factor in this problem. The City was also concerned about the increasing amount of unlawful soliciting by livery drivers, a practice difficult to prevent so long as livery drivers (pretending to be meeting reserved passengers) were able to park outside the terminals and leave their cars unattended for extended periods of time. The City hired the aviation consulting firm Landrum & Brown to undertake a study of traffic congestion in the roadways around the terminals at O'Hare and to recommend solutions.

Landrum & Brown undertook an extensive study of traffic conditions at O'Hare. The firm determined that suburban liveries were the fourth highest users of airport roadways in terms of vehicle volume while city liveries were the eighth highest users. The firm also found that approximately 23% of the suburban liveries and 50% of the city liveries were left unattended outside the terminals; however, because the vast majority of livery vehicles servicing O'Hare at the time were suburban liveries, and because Landrum & Brown found that most City-bound passengers made reservations in advance, the firm concluded that the suburban liveries posed the greater problem in terms of congestion and soliciting.

Landrum & Brown recommended that a livery dispatch system be established. Under the proposed plan, all liveries coming to the airport without passengers would be required to park in a staging area away

from the terminals until informed that a passenger was waiting at the terminals. Once a livery driver received word that a passenger was waiting, he would drive to a designated loading area, load the passenger and depart.

Despite the differences between city liveries and suburban liveries noted by Landrum & Brown in its study, the proposed plan did not provide for any difference in their entitlement to use the livery dispatch system.[4] All liveries without passengers were to be required to proceed to the staging and wait for either a reserved passenger to arrive or for notice that a walk-up passenger was seeking livery service at the terminals.

The proposed plan did treat city liveries differently than suburban liveries, however, in one significant respect. Based on Landrum & Brown's determination that most City-bound passengers made reservations in advance, city liveries were to be allowed 15 minutes in the designated loading areas so that their drivers could meet the reserved passengers inside the terminals and assist them with their bags. On the other hand, because the suburban liveries were the primary transgressors of the no-soliciting law, and because most suburb-goers were walk-up passengers in any case, Landrum & Brown recommended that the suburban livery drivers be prohibited from leaving their vehicles unattended and be given just five minutes to load their customers and depart.

Landrum & Brown proposed three alternative livery dispatch systems—that is, methods of informing livery drivers in the staging area that customers seeking livery transport were waiting at the terminals. Under the "on-site" system, customers would use telephones in the terminals to call dispatchers in the staging area, who would then inform the livery drivers that a customer was waiting. Under the "termi-nal system", customers would approach dispatchers at booths inside the terminals; these dispatchers would then telephone the dispatchers in the staging area. Under the "off-site" system, customers would use telephones in the terminals to call dispatchers in the offices of the livery companies, who would in turn contact the livery drivers in the staging area. All three proposals were designed to reduce traffic congestion caused by livery vehicles standing unattended at the terminals. They were also expected to reduce soliciting, since suburban drivers would have to remain with their vehicles outside the terminals and, under the "terminal system," the dispatchers inside the terminals would have to remain at their booths.

Following Landrum & Brown's release of its study and proposed solutions in February, 1974, the City held a series of meetings with suburban livery operators and representatives from the Northern Illinois Livery Owners Association ("the NILOA"), an organization of suburban (i.e., non-city-licensed) livery companies. After initially objecting to any dispatch system, the suburban livery operators and NILOA representatives expressed a preference for the "terminal system"—i.e., the system employing dispatch booths within the terminals. A NILOA attorney drafted a contract that would have permitted only NILOA members to have access to the booths and would have provided for the payment of rent to the City, but this contract was never executed.

In January, 1975, the City promulgated regulations putting Landrum & Brown's proposed "terminal system" into effect, with one important change. Rather than allowing all liveries to receive passenger requests for service from the dispatch booths, only the suburban livery companies were allowed to use the booths, which were to be manned by representatives of these

---

**4.** The City states in a number of places that Landrum & Brown's proposed plan did treat the city liveries and the suburban liveries differently with respect to their rights to use the livery dispatch system. In support of these statements, the City cites the testimony of a Landrum & Brown official that the firm saw no reason to have a livery dispatch system for the city liveries. Nevertheless, the City also provided with its summary judgment motion a copy of Landrum & Brown's final proposals, and nothing in them indicates that the proposed plan envisioned precluding city liveries from the system.

companies. City liveries, even those willing to transport passengers to the suburbs, were prohibited from receiving orders from the dispatch booths, and could use the staging area only to wait for reserved passengers. Thus, city liveries coming to O'Hare without reserved passengers—e.g., when dropping off passengers—had no (lawful) way to obtain business from walk-up passengers, and had to leave the airport empty.

From 1975 through 1977, the 1975 regulations remained in effect, and the City attempted to enforce them. Although soliciting, particularly by suburban liveries, continued to be a problem, it was reduced. And city liveries, though occasionally receiving word that a city-bound passenger had found his way to a dispatch booth, were largely precluded from the livery dispatch system and, consequently, the walk-up passenger market.

In 1977, however, two of the suburban livery companies, Amm's Limousine Service, Inc. ("Amm's Limousine") and O'Hare–Midway Limousine Service, Inc. ("O'Hare–Midway Limousine"), acquired city licenses by assignment. Both companies established affiliated companies to use the City licenses—Amm's Limousine Service, Inc. No. 2 ("Amm's No. 2") and O'Hare–Midway Limousine Service, Inc. No. 2 ("O'Hare–Midway No. 2").

Soon thereafter, dispatchers in the livery booths began calling liveries from Amm's No. 2 and O'Hare–Midway No. 2 whenever city-bound passengers requested service at the dispatch booths. At about the same time, a dispatcher with the Midwest Livery Association ("the MLA"), another organization of suburban livery companies, began to make arrangements with individual drivers of city-licensed liveries to call them if they encountered someone seeking livery transportation from O'Hare to downtown. Some City officials knew that a limited number of city livery companies were using the livery dispatch system to obtain City-bound passengers, but permitted this activity to continue.

Beginning in 1977, then, all travelers arriving at O'Hare who had not made ground transportation plans in advance could obtain livery service by having dispatchers at the livery dispatch booths call for liveries waiting at the staging area. Livery passengers heading for the suburbs might find themselves in the vehicles of any one of a number of livery services. Livery passengers destined for a location within the City, however, would receive service from only two limousine companies, Amm's No. 2 and O'Hare–Midway No. 2.

In 1977, three city livery companies not affiliated with suburban liveries filed suit in Illinois state court against Amm's Limousine, O'Hare–Midway Limousine and the City. They alleged, *inter alia*, that the City was discriminating against them by unlawfully permitting the two defendant companies to use the livery dispatch system while prohibiting the plaintiff companies from doing so, and that the defendant companies were unlawfully using the terminal dispatch booths to solicit City-bound passengers for their affiliated companies. *Chicago Rental Courtesy, Inc. v. City of Chicago*, 77 CH 6972 (Circuit Court of Cook County).

On January 6, 1982, Judge Porter ruled against the City. He first found that the City's policy with respect to the plaintiff city livery companies violated their Fourteenth Amendment rights to the equal protection of the laws. He then granted the plaintiffs injunctive as well as monetary relief, ordering the City to permit the plaintiff companies to use the livery dispatch system, and awarding the plaintiffs a total of nearly $2 million in damages.

On September 10, 1982, after both sides had filed appeals of the trial court's ruling, the parties entered into settlement agreements. The agreements provided that all appeals were to be voluntarily dismissed and that the City was to pay the plaintiffs a total of around $1.2 million in damages; the injunction was to remain in full force and effect.

From 1982 through 1986, the *Chicago Courtesy* plaintiffs together with Amm's No. 2 and O'Hare–Midway No. 2 employed the livery dispatch system to provide livery service to City-bound passengers from

O'Hare. All other city livery companies, however, remained barred from the livery dispatch system.

In March, 1986, the City removed the livery booths from O'Hare. Soon thereafter, the City and the *Chicago Courtesy* plaintiffs entered into another set of settlement agreements. In these agreements, the City agreed to pay the plaintiffs an additional total of approximately $53,000 as the second "installments" of their 1982 agreements. In return, the plaintiffs agreed to join the City in a motion before the Circuit Court to vacate the 1982 judgments. On June 20, 1986, the court entered an Agreed Final Judgment in the *Chicago Courtesy* case, vacating the 1982 judgment, declaring that all findings and conclusions were null and void, and dismissing the action with prejudice.

In 1987, Judge Curry of the Circuit Court of Cook County, Illinois dismissed with prejudice a lawsuit brought by two other city livery companies against the City, *Gold Coast Auto Livery, Inc. v. City of Chicago*, 85 CH 575 (Order, August 3, 1987). The plaintiffs had alleged wrongdoing similar to that found by Judge Porter in 1982. Judge Curry, however, stated that he disagreed with Judge Porter on the merits of the city livery companies' equal protection claims and that, in any case, plaintiff's claims had accrued in 1975 and were thus barred by the statute of limitations. The *Gold Coast Auto* plaintiffs initially filed an appeal of Judge Curry's ruling, but subsequently withdrew it.

All ten of the plaintiffs here acquired their City licenses either before the City implemented the 1975 regulations, or while the regulations were in effect. All were prohibited from using the dispatch livery system throughout the period prior to its termination. They claim that the infringement on their ability to obtain passengers at O'Hare deprived them of property without due process of law. They also claim violations of their equal protection rights, first in the differential treatment between city and suburban liveries effected by the 1975 regulations, and later in their continued preclusion from the livery dispatch sys-

tem despite the City's acquiesence in the use of the system by other city livery companies. Finally, the plaintiffs allege that the City and the suburban livery companies entered into a conspiracy to violate the plaintiffs' constitutional rights.

## II.

### The Conspiracy Claim Against All Defendants

■ Before turning to the rather complicated issues involved in the claims against the City alone, the court can more readily dispose of the conspiracy claim against all defendants. Count II alleges that the defendant livery companies conspired with the City to violate the constitutional rights of the plaintiffs, and that because of this conspiracy the private defendants may be held liable under § 1983 despite the fact that they were not state actors as required by that section. *See Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir.1988).

The elements of a § 1983 conspiracy are by now well-settled:

[T]o establish a prima facie case of a civil conspiracy, a plaintiff must show (1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement.

*Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir.1988). The plaintiffs cannot satisfy the first element.

■ The conspiracy theory focuses on the fact that it was only after the meetings between City officials and the suburban livery representatives that the City decided to implement Landrum & Brown's terminal system, and do to so in a way that excluded city liveries from the booths. Yet, the plaintiffs concede that the suburban liveries at first objected to any change in the then-existing system, and only took a position favoring the terminal system after the City had told them that one of the three proposed systems would be implemented at O'Hare. Although the parties have not cited, and this court is not aware of, any

case directly on point, it seems clear to this court that when a government body instructs a private party to choose among a variety of ways of doing business, the fact that the private party acquiesces in one of those ways in order to save its business does not make its agreement to do so a "meeting of the minds" for the purposes of § 1983 conspiracy law.

As Judge Posner recently stated, "To be liable as a conspirator you must be a *voluntary* participant in a common venture." *Jones v. City of Chicago*, 856 F.2d at 992 (7th Cir.1988) (emphasis added). The suburban livery companies here were not voluntary participants in a joint venture with the City. They were forced to accept the City's decision to implement some form of livery dispatch system. To be sure, they did present the City with a contract that would have bound the City to exclude the city liveries from the booths, but the City rejected this contract and thereby retained for itself complete control over the form of the livery dispatch system. The plaintiffs have presented no evidence from which a jury could find that the City and the suburban livery companies agreed to anything. *Cf. Monsanto Co. v. Spray–Rite Services Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 1472, 79 L.Ed.2d 775 (1984) (to prove antitrust conspiracy, "there must be evidence that tends to exclude the possibility of independent action"). Accordingly, judgment will be entered for all defendants on Count II of the complaint.

### The Claims Against the City

Count I contains the claims against the City alone for allegedly violating the plaintiffs' equal protection and due process rights. The plaintiffs have moved for partial summary judgment on the issue of liability; the City has moved for summary judgment on the grounds that the claims are time-barred and that, in any case, it has not violated the plaintiffs' constitutional rights.

#### 1. Statute of Limitations

The City first argues that it is entitled to judgment on all of the claims in Count I because the plaintiffs' suit is barred by the statute of limitations. The parties agree that a five-year limitations period applies to this lawsuit, *see Anton v. Lehpamer*, 787 F.2d 1141 (7th Cir.1986), and that the alleged unlawful livery dispatch system remained in effect when this suit was filed. Nevertheless, the City maintains that because the livery dispatch system was put into place in 1975, and because the plaintiffs did not file their complaint until 1983, any claim attacking the system is late. The City is half right.

Although the parties engage in a good deal of wrangling over what constitutes a "continuing violation" for statute of limitations purposes, both sides ignore the very different nature of the plaintiffs' two claims. With respect to the due process violation, the plaintiffs' claim that the system deprived them of property—i.e., full use of their livery licenses—without due process of law clearly accrued on the date the livery dispatch system prohibiting them from using the dispatch booths went into effect. On that date, the plaintiffs lost whatever property right they may have had to participate in the system, and any damages flowing from that loss were merely the continuing ill effects of the original violation. Accordingly, judgment will be entered against the plaintiffs on their due process claim.

The equal protection claim presents an entirely different story. The City maintains that, like the due process claim, this claim accrued in 1975. That is, because the exclusion of the plaintiffs from the dispatch booths occurred in 1975, the City contends that they had five years to challenge this exclusion before their right to damages came to an end. Yet, while the loss of a property right accrues at the moment the property right is lost, discriminatory exclusion from a government benefit continues so long as the discriminatory policy remains in effect.

It is true that courts have treated some equal protection claims in a fashion similar to antitrust refusal-to-deal claims, and held that when a discriminatory act takes place, the limitations period begins to run. *See, e.g., Ward v. Caulk*, 650 F.2d 1144 (9th

Cir.1981) (claim of discriminatory refusal to promote accrued at time promotion was denied). But these cases, like their antitrust analogs, are predicated on firm and irrevocable actions by the alleged wrongdoer. *See, e.g., In re Multidistrict Vehicle Air Pollution,* 591 F.2d 68, 72 (9th Cir.), *cert. denied,* 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979) (refusal to deal was "irrevocable immutable, permanent and final"). Here, by contrast, the City concedes and the evidence shows that the livery dispatch system remained tentative and subject to change from the day it went into effect. Accordingly, the City cannot rely on these cases. In 1983, when this case was filed, the plaintiffs remained subject to the City's enforcement of its (allegedly) unlawful policies, and they are therefore entitled to pursue their efforts to right this (alleged) wrong.[5] *See Perez v. Laredo Junior College,* 706 F.2d 731, 734 (5th Cir. 1983) ("[I]f the statutory violation occurs as a result of a continuing policy, itself illegal, then the statute does not foreclose an action aimed at the [defendant's] enforcement of the policy within the limitations period."); *cf. Sherer v. Balkema,* 840 F.2d 437 (7th Cir.1988) (statute of limitations does not bar civil conspiracy claims for acts committed within the limitations period even if the agreement was entered into outside the limitations period).

### 2. Laches

■ The City next argues that the doctrine of laches should bar the claims. The plaintiffs respond that, at least in this circuit, the laches defense is not available in cases seeking only a legal remedy, citing *Morgan v. Koch,* 419 F.2d 993, 996 (7th Cir.1969). The City maintains, however, that the statement to this effect in *Morgan* was dicta, and urges this court to follow Judge Shadur's ruling in *Harris v. Beynon,* 570 F.Supp. 690 (N.D.Ill.1983), that "[l]aches is an appropriate defense to legal claims as well as equitable claims." *Id.* at 692 n. 3. This court declines to follow that lead.

As the Seventh Circuit explained in *Cannon v. University of Health Sciences/The Chicago Medical School,* 710 F.2d 351, 358–59 (7th Cir.1983), although *Morgan* contained dicta on some aspects of the laches defense, the *Morgan* court also specifically held "that laches do not apply to an action seeking purely legal relief." *Cannon,* 710 F.2d at 359. The dicta pertained to whether or not "laches can[ ] be relied upon so as to permit equitable relief when the statute of limitations on the analogous legal claim bars recovery," *id.,* an issue not relevant here. But the validity of the holding in that case has never been questioned by the Court of Appeals, and this court can see no basis for doing so here. Accordingly, the defense of laches does not apply in this case.

■ Moreover, even if it did, it would not bar the plaintiffs' claims. In order to prevail on a laches defense, the City must show both lack of diligence on the plaintiffs' part in bringing their claims and prejudice to the City resulting from the delay. *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961); *Zelazny v. Lyng,* 853 F.2d 540, 541 (7th Cir.1988). Whatever the reason for the plaintiffs' delay in bringing this suit, the City cannot show that it was prejudiced.

In *Zelazny,* the Seventh Circuit reaffirmed what it had said in *Lingenfelter v. Keystone Consolidated Industries, Inc.,* 691 F.2d 339, 341–42 (7th Cir.1982)—to wit: that in considering the prejudice issue, the district court can consider both "the loss of evidence diminishing the defendant's chances of success at trial" as well as the "unfairly accentuated damages occasioned only by a plaintiff's unreasonable delay." *Zelazny v. Lyng,* at 553–54. The City can show neither.

With regard to the City's contention that important evidence regarding the implementation of the livery dispatch system has become stale, the City's strongest argument on this score fell when the conspiracy

---

**5.** The court need not decide at this juncture whether the statute of limitations bars the plaintiffs' claims for damages incurred more than five years prior to the commencement of this action.

claim did. While it may well be true that the evidence regarding the relationship between City officials and the suburban livery representatives lost some of its luster from 1975 to 1983, so that trying the issue now would be unfair, there is nothing in the nature of plaintiffs' equal protection claims that requires the reliance on the memories of witnesses dating back all those years. The plaintiffs contend that their treatment under the livery dispatch system in effect from 1975 (or 1977) through 1983 was not rationally related to a legitimate government objective, and the City can point to nothing in the record suggesting that their ability to defend against this claim has been prejudiced by the plaintiffs' delay.

Similarly, the City cannot rely on the accumulation of damages over the years to show unfair prejudice. From as early as 1977, when the *Chicago Courtesy Rental* case was filed, the City was well aware that city livery companies viewed the livery dispatch system as violative of their equal protection rights. Nevertheless, the City insisted on keeping the system in place, even after the judge in that case held in no uncertain terms that the system was unconstitutional. Thus, the City may not avoid responsibility for the accumulation of the plaintiffs' damages in the ensuing years.

### 3. Collateral Estoppel

The plaintiffs' first argument in support of their partial summary judgment motion relies on the state court's ruling in the *Chicago Courtesy Rental* case. According to the plaintiffs here, this judgment is binding on the City and conclusively establishes

the City's liability in this lawsuit under the doctrine of collateral estoppel—or issue preclusion.

Because the previous lawsuit took place in Illinois, this court must give that judgment the same preclusive effect, if any, as would the Illinois courts. *See Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). The Illinois Supreme Court has set forth the elements of collateral estoppel as follows:

> [T]he only questions for the utilization of collateral estoppel are: (1) whether the issue decided in the prior adjudication is identical with one presented in the case in question; (2) whether there had been a final judgment on the merits; and (3) whether the party against whom estoppel is asserted is a party or in privity with a party to the prior adjudication.

*Ballweg v. City of Springfield*, 114 Ill.2d 107, 102 Ill.Dec. 360, 499 N.E.2d 1373 (1986).

The City concedes that the Chicago Courtesy Rental ruling satisfies elements (1) and (3).[6] The City also does not dispute that the ruling became a "final judgment on the merits" when the time for appeal passed in 1982. Thus, the plaintiffs insist, all three of the elements for collateral estoppel in Illinois have been met, and they are entitled to invoke it.

■ The City, however, raises a host of arguments for not applying collateral estoppel to this case. The most important and, as it turns out, the determinative one, focuses on the state court's 1986 order vacating the 1982 judgment pursuant to the parties' final settlement agreements.[7]

---

6. The City does argue that, even if collateral estoppel does apply, some of the plaintiffs would not be entitled to summary judgment because they have not proven injury. Although technically a plaintiff in a § 1983 action must prove some injury in order to recovery, *Williams v. Boles*, 841 F.2d 181, 183 (7th Cir. 1988), there is no doubt that every city livery lost some business as a result of not being able to service O'Hare. Just how much would be the inquiry at a trial on damages.

7. The other grounds asserted by the City for not applying collateral estoppel in this case are as follows: first, because Judge Curry's subsequent

ruling in the *Gold Coast Auto* case discredited the *Chicago Courtesy Rental* result; second, because as a municipal government with general governmental responsibilities the City should not be subject to nonmutual collateral estoppel; third, because the *Chicago Courtesy Rental* ruling was plainly erroneous; fourth, because the plaintiffs could have joined the *Chicago Courtesy Rental* action; fifth, because collateral estoppel would not reduce trial time; and finally, sixth, because the plaintiffs waited five years after filing this lawsuit to assert the collateral estoppel issue. Because the City's primary argu-

Because "the general rule is that a judgment that is vacated, for whatever reason, is deprived of its conclusive effect as collateral estoppel," *Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir.1985), the City contends that the *Chicago Courtesy Rental* ruling has no preclusive effect here. The plaintiffs challenge this position in two ways.

They first argue that the general rule does not apply in Illinois. According to the plaintiffs, the three elements set forth in *Ballweg* are the only relevant considerations in deciding whether collateral estoppel should apply. More specifically, the plaintiffs insist that because the Illinois Supreme Court stated in *Ballweg* that collateral estoppel requires only that "there *had been* a final judgment on the merits," *Ballweg v. City of Springfield*, 114 Ill.2d at 573, 102 Ill.Dec. 360, 499 N.E.2d 1373 (emphasis added), and because a judgment becomes final for collateral estoppel purposes once the time for appeal has passed, the fact that a judgment is vacated subsequent to the time for appeal does not alter its preclusive effect.

This argument offends logic. While it is true that, in the case of an unappealed judgment, collateral estoppel comes into play once the time for appeal has elapsed, it is nonsensical to argue that, if the judgment is subsequently vacated—say, for example, on the grounds that it was procured through fraud—the original judgment remains binding in other litigation. Like Rule 60(b) of the Federal Rules, Illinois procedural law provides that the mere filing of a motion for relief from judgment does not impair the effect of a final judgment. Ill.Rev.Stat. ch. 110, ¶ 2–1401(a). However, where the judgment is subsequently vacated by a court with the power to do so, it is rendered a nullity and loses its preclusive effect. *See Matchett v. Rose*, 36 Ill.App.3d 638, 344 N.E.2d 770 (1976).

The plaintiffs next argue that, even if a properly vacated judgment does remove the collateral estoppel effect of an Illinois judgment, the 1986 order did not do so because the state court did not have the power to issue it, for two reasons: first,

because the court no longer had the jurisdiction over the matter; and, second, because the 1982 judgment had been satisfied and under Illinois law a satisfied judgment cannot be vacated until the satisfaction is set aside.

■ The first argument ignores Illinois caselaw. While it is generally the rule that a court loses jurisdiction over a case thirty days after the entry of judgment, *see* Ill. Rev.Stat. ch. 110, ¶ 2–1203; *People v. Huntley*, 144 Ill.App.3d 64, 98 Ill.Dec. 172, 493 N.E.2d 1193 (1986), it is a longstanding doctrine of Illinois law that "jurisdiction revest[s] in the trial court when the parties to the suit voluntarily appear [ ] more than 30 days after an order [is] entered." *Burris v. John Blue Co.*, 44 Ill.App.3d 653, 656, 3 Ill.Dec. 326, 358 N.E.2d 724 (1976); *Brown v. Miner*, 408 Ill. 123, 96 N.E.2d 530 (1951); *Johnson v. Empire Mutual Insurance Co.*, 70 Ill.App.3d 780, 782, 27 Ill.Dec. 79, 388 N.E.2d 1042 (1980) ("[T]he voluntary appearance and participation of the parties in further proceedings may revest the trial court with personal and subject matter jurisdiction."). Thus, the state court regained jurisdiction over the action when the parties voluntarily moved to vacate the 1982 judgment in 1986.

■ The plaintiffs' second attack on the state court's power to vacate the 1982 judgment has a stronger footing in state law. In *Fournier v. Kitsos*, 27 Ill.App.2d 464, 169 N.E.2d 803 (1960), the Illinois Appellate Court reversed a trial court's order vacating a satisfied judgment "without first setting aside the satisfaction." *Id.* at 465, 169 N.E.2d 803. Thus, the plaintiffs argue, the trial court's order vacating the judgment here was invalid, and the 1982 judgment stands.

This argument, though not without force, contains one critical defect. This court will not give effect to an order issued by a state court without jurisdiction to issue it, but this court does not have the power to correct errors of law or fact within the state court's jurisdiction. *Fournier* states that the trial court committed re-

ment prevails, this court need not and will not address these alternative arguments.

versible error in vacating the satisfied judgment before first setting aside the satisfaction, but nothing in that opinion states that the trial court acted without jurisdiction in doing so. *See id.* Thus, although the state appellate court could have corrected the trial court's error vacating the judgment there, this court cannot.

This last observation takes us to the heart of the issue in this case. In *Burris v. John Blue Co.*, 44 Ill.App.3d 653, 3 Ill. Dec. 326, 358 N.E.2d 724 (1976), the court held that where parties to a lawsuit settle a case after judgment, and consent to the trial court vacating the judgment, a non-party may not intervene to challenge the vacation. Standing alone, that ruling makes good sense. But if the non-party to that action is also prohibited from disputing the vacation in a subsequent lawsuit, even one in which he is a party, then the actions of the parties and the court in vacating the judgment will fall beyond appellate oversight. What's more, if the parties engage in fraud in the process of moving the trial court to vacate the original judgment, their agreed motion to vacate will be beyond the effective purview of any court.

The plaintiffs point to the Seventh Circuit's recent ruling in *In re Memorial Hospital of Iowa County, Inc.*, 862 F.2d 1299 (7th Cir.1988) (Easterbrook, J.), in arguing that this court should reject that result and give effect to the 1982 judgment. In *Memorial Hospital*, the Court stated that when parties with an appeal pending before the Court settle and move the court to issue an order vacating the trial court's judgment, the Court will decline to do so. The Court grounded its ruling on the public significance of judicial rulings: The parties are free to agree to settle a private dispute, and even "to contract about the preclusive effects of these judgments *inter se* ...; they are not free to contract about the existence of these decisions. *Id.* at 1303. Once the resolution of a dispute is memorialized in a judicial ruling, it becomes an historical document and should not be nullified simply at the request of the individual parties.

One immediate problem with applying *Memorial Hospital* to this case lies in the different posture of each. The issue in *Memorial Hospital* was whether to vacate a judgment in the first instance. The issue here, by contrast, is whether to give effect to a judgment that has already been vacated by another court. Thus, while *Memorial Hospital* indicates what the Seventh Circuit would have done had it been sitting in Judge Porter's place in 1986, it does not speak directly to how the Seventh Circuit would deal with the situation currently facing this court.

■ Still, were this court applying federal law here, it would follow the reasoning of the Seventh Circuit and rule that the *Chicago Courtesy Rental* judgment should be given preclusive effect. *See also Chemetron Corp. v. Business Funds, Inc.*, 682 F.2d 1149, 1190–92 (5th Cir.1982) (permitting use of offensive collateral estoppel under federal law where defendant had settled previous lawsuit after trial but before final judgment was entered). Whatever the technical validity of the state court's order vacating that judgment, it is quite clear from the record that the order was procured for the single purpose of freeing the City from the adverse rulings rendered there. The City did not seek to establish that the original ruling was incorrect, or otherwise unfair. It merely paid the plaintiffs $55,000 and wiped the slate clean. On February 18, 1986, it was guilty; on February 19, without showing that a single thing had changed, it was absolved of its guilt and free to insist it had done nothing wrong.

Similarly, the *Chicago Courtesy Rental* plaintiffs did not agree to the vacation because they suddenly realized that they were wrong, nor did they do so to avoid having to expend money on an appeal. They agreed for one reason and one reason only—they had nothing to lose and $55,000 to gain. They were paid the money and walked away. The state trial court allowed them to go, and left the plaintiffs here, as well as this court, holding the bag.

Had this court the power, it would reject that result. Unfortunately, it does not.

Although it is possible that the Illinois Supreme Court would hold that under the circumstances of this case collateral estoppel should apply,[8] there is not one shred of evidence in Illinois caselaw permitting this court to so find. A long line of state cases instructs that the state trial court had jurisdiction to vacate the 1982 judgment, and another line of cases says that such orders remove the binding effect of the judgments they vacate. This court has no power to rule otherwise here. Accordingly, the plaintiffs' effort to rely on the *Chicago Courtesy Rental* judgment must be denied.

#### 4. The Equal Protection Clause

With the preliminary matters now resolved, this court can turn to the central issue in this case: whether the livery dispatch system violated the plaintiffs' rights to the equal protection of the law. In undertaking this inquiry, the legal landscape is a well-travelled one:

> The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the law," which is essentially a direction that all persons similarly situated should be treated alike. Section 5 of the Amendment empowers Congress to enforce this mandate, but absent controlling congressional direction, the courts have themselves devised standards for determining the validity of state legislation or other official action that is challenged as denying equal protection. The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.

*Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439–40, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (citations omitted). Since there is no dispute that the livery dispatch system was implemented in furtherance of legitimate City interests—i.e., the reduction of traffic congestion and un-

lawful soliciting—the only question that remains is whether the classifications employed by the system were rationally related to these interests. *City of New Orleans v. Dukes*, 427 U.S. 297, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1976).

The first question that arises, of course, is just what were the relevant classifications. There is no doubt that, from 1975 through 1977, the livery dispatch system treated city liveries differently from suburban liveries. The plaintiffs maintain, however, that these classifications changed in 1977 when the two city livery affiliates of suburban livery companies began using the livery dispatch booths to obtain City-bound passengers. From that point on, the plaintiffs argue, the equal protection inquiry must focus on whether allowing the two suburban-affiliated city livery companies to use the booths, but prohibiting the remaining city liveries from doing so, was rationally related to the City's interests.

■ The City's first response to these two equal protection claims is that the City did not view the livery dispatch booths as privileges or concessions at all, so it had no obligation to grant access to them on an equal footing. This argument merits little discussion. Whether or not the City officials consciously perceived the benefits of the dispatch booths, it is obvious that these booths provided substantial benefits to those companies permitted to use them. Through them, liveries were given access to passengers seeking livery service who had come to O'Hare without making reservations in advance. Indeed, the only way that a livery, whether city or suburban, could gain access to such passengers was through the booths, since solicitation remained unlawful for all livery drivers even after the system went into effect. By prohibiting the plaintiffs from using them, the City deprived them of an important source of business, and accordingly could do so only in conformity with the strictures of

---

**8.** As discussed above, Illinois case law does support the plaintiffs' argument that the state court erred in vacating the satisfied judgment without first setting aside the satisfaction. But, as explained there, this court may not collaterally review for non-jurisdictional defects the state court's order. Thus, the only question here is whether, given a valid order vacating the judgment, the Illinois Supreme Court would decline to give it preclusive effect.

the Equal Protection Clause. *See Daniel v. Family Insurance Co.*, 336 U.S. 220, 224, 69 S.Ct. 550, 552, 93 L.Ed. 632 (1949) ("We cannot undertake a search for motive in testing constitutionality."); *Sams v. Ohio Valley General Hospital Association*, 413 F.2d 826, 828 (4th Cir.1969).

█ The plaintiffs contend that two aspects of the City's classifications under the original plan were irrational, and therefore violative of the clause. First, they maintain that creating the booths for passengers going to the suburbs, but not for City-bound passengers, was irrational since liveries servicing the latter (the city liveries) created the same sorts of problems as did the suburban liveries. By excluding the city liveries from using the booths, the City left a part (if only a relatively small part) of the livery problem intact. Yet, the fact that the City chose to address only a portion of the problems caused by liveries, and that the effect of this partial enforcement was to disadvantage the city liveries vis-a-vis the suburban ones, does not render the livery dispatch plan unconstitutional.

In *Williamson v. Lee Optical Co.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), Oklahoma had passed a law prohibiting any person not a licensed optometrist or opthamologist from fitting or selling eyeglasses without a written prescription of an optometrist or opthamologist. The law, however, exempted ready-to-wear glasses, so sellers of these glasses were able to sell them without a prescription. Sellers of ordinary eyeglasses contended that the law violated their equal protection rights, arguing that there was no rational basis for distinguishing between fitted eyeglasses and ready-to-wear glasses.

The Supreme Court upheld the statute. Without commenting on the wisdom of the classifications, the Court held that they did not violate the Equal Protection Clause because "[t]he legislature may select one phase of one field and apply a remedy there, neglecting the others." *Id.* at 489, 75 S.Ct. at 465. The statute did not distinguish between sellers of fitted eyeglasses and sellers of ready-to-wear glasses—the

former could freely sell ready-to-wears and the latter would need a prescription to sell fitted glasses—so the fact that the practical effect of the law was to burden the former relative to the latter simply was not of constitutional concern.

*Williamson* informs the analysis here. The City was entitled to deal with the problems caused by suburb-goers and ignore the very same problems caused by City-goers without running afoul of the Equal Protection Clause, even if this meant impacting on the city liveries differently than on the suburban liveries.

█ The plaintiffs next contend, however, that the City cannot justify its 1975 plan in this way because, by excluding city liveries from the booths, it not only prevented them from obtaining City-bound passengers but also excluded them from the market for suburbanites, a market they were fully entitled to access with their City licenses. In other words, since the city liveries and the suburban liveries were similarly-situated with regard to suburb-goers, the plaintiffs insist that the City could not treat them differently when it came to these passengers.

This argument is not without force. The number of travelers taking liveries to the suburbs was growing rapidly during that period, and there appears no good reason why the City chose to exclude city liveries from competing for these passengers through the use of the booths. Indeed, the City's purported interest in reducing the traffic congestion caused by, and the solicitation of, suburban livery passengers, could only have been furthered by giving the city liveries access to the livery dispatch booths.

Yet, the Constitution does not require a good reason, just a rational one. When the City took on the livery problem in 1975, it quite clearly viewed city liveries as servicing primarily City-bound passengers and suburban liveries as servicing suburb-goers, with good reason: The number of city liveries coming to O'Hare was quite small relative to the number of suburban liveries, and most of the former came there to meet passengers with reservations.

Thus, the City could have concluded that providing space at the booths for city liveries to obtain suburban passengers was unnecessary.

Once the City learned that city liveries wanted to compete with the suburban liveries, it could no longer justify its refusal to allow them to do so on ignorance. It could, however, justify continuing to exclude them from the booths based on another legitimate city interest: the desire to ensure continued, efficient livery service for all livery passengers leaving O'Hare. While the city liveries and the suburban liveries were similarly situated with respect to suburb-bound passengers, there remained a critical difference between the two: the city livery license. The City was entitled to demand of its licensees, along with the special privilege they received from the license—i.e., the right to transport passengers between two city locations—that they accept the burden of refraining from participating in the suburban market at O'Hare. The number of city liveries was strictly limited by the City, and it was not irrational for the City to adopt a system that forced these liveries to service only those passengers to which they alone were given access. Furthermore, the City could rationally have determined that, in order to ensure the continued willingness of suburban liveries to servicing O'Hare, the city liveries should be prohibited from competing with them. *Cf. City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).

This justification for the 1975 system does not wash, however, when it comes to the new classification that, the plaintiffs contend, the City adopted in 1977. While this court has determined that the City (just barely) acted within the bounds of the Equal Protection Clause in prohibiting city liveries from competing with suburban liveries for suburban passengers, the City has not even hinted at a rationale for treating city livery companies affiliated with suburban liveries differently from all other city liveries.

*Hestor v. Rizzo,* 454 F.Supp. 537 (E.D.La. 1978), a case relied on heavily by the City, held that it was permissible for the City of New Orleans to allow taxicabs with City of Kenner licenses to service all passengers leaving New Orleans International Airport, but to prohibit non-Kenner taxis from transporting passengers to Kenner. Nothing in that case, however, suggests that the court would have countenanced treating some Kenner licensees differently than others with respect to Kenner-bound passengers. *See Bankers Life & Casualty Co. v. Crenshaw,* —— U.S. ——, 108 S.Ct. 1645, 1653, 100 L.Ed.2d 62 ("[A]rbitrary and irrational discrimination violates the Equal Protection Clause under even our most deferential standard of review.").

Although the City does not offer a rationale for treating the city livery companies differently, it does suggest one reason why the disparate treatment occurred—i.e., because, so long as the suburban affiliates used the livery dispatch system, the City really did not care who else made use of the booths. In one sense, this argument is a red-herring. The City obviously did care who used the system, for it prohibited the city liveries from doing so. Yet, at another level, this point does raise an issue that might well ultimately salvage the City's case.

■ In order to show that they were the victims of discrimination by the City, the plaintiffs must demonstrate that the City actually adopted a system of allowing the two suburban-affiliated city livery companies to participate in the livery dispatch system. To do so, it is not enough for them to show that the City failed to enforce its ordinances "with Prussian thoroughness." *Hameetman v. City of Chicago,* 776 F.2d 636, 641 (7th Cir.1985). They must establish that the City, through its officials in positions of policy-making authority, consciously administered the livery dispatch system so as to discriminate against them. *See Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985); *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446 (1962); *Mahone v. Addicks Utility District of Harris County,* 836 F.2d 921, 932 (5th Cir.1988) ("[T]he Su-

preme Court explained long ago [that] equal protection of the law requires not only that laws be equal on their face, but also that they be executed so as not to deny equality.") (citing *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)).

The City has come very close to conceding that it did so. In its Local Rule 12(e) Statement of Material Facts Not in Dispute, the City stated that it would assume, for the purposes of its summary judgment motion, that City officials condoned the activity of those city liveries participating in the livery dispatch system, but that it did not concede this fact for trial. Then, in response to the plaintiffs' Local Rule 12(e) statement in support of their own summary judgment motion, the City "admitted" as undisputed that a limited number of city liveries were permitted to use the livery dispatch system despite the ordinance prohibiting them from doing so. This admission could be read as establishing the City's adoption of such a policy.

Nevertheless, this court finds sufficient ambiguity in the City's admission to preclude summary judgment at this stage. While the City admitted that certain city liveries were permitted to use the livery dispatch booths beginning in 1977, the admitted statement did not specify who granted this permission. The livery dispatch booths were manned by representatives of the suburban livery companies, and if they alone were responsible for giving business to the two suburban-affiliated city livery companies, without the express or implied acquiescence of City officials, then

the City is not liable for the disparate treatment that resulted. The plaintiffs have presented some evidence that city officials knew, or were deliberately indifferent to, what was going on, but their evidence does not establish the absence of a genuine factual issue on this score.[9] Accordingly, the court will deny both the plaintiffs' as well as the City's motions for summary judgment, and set the case for trial.

*The City's Motion In Limine*

The City has moved in limine for an order prohibiting the plaintiffs from asserting a theory of damages that, according to the City, the plaintiffs did not reveal until more than four years into this case. Remarkably, however, in more than fourteen pages of briefs on the issue, the City did not once indicate what the plaintiffs' original theory of damages was, what the new theory is, or how the latter differs from the former. Nor did the City describe why the plaintiffs' original theory of damages failed to put them on notice as to the new one.

Now it might well be the case the plaintiffs have sprung a surprise on the City by suddenly raising a theory of damages the City could not have anticipated. If they did, and if the City was prejudiced by this action, then the City would surely be entitled to some form of relief. But this court has no intention of reading through pages and pages of interrogatories and answers in an attempt to understand the City's arguments and rule on them. Accordingly, the court will deny the City's motion at this juncture. If the City so chooses, it may correct the deficiencies in the motion and try again.

**9.** It is important to emphasize here that this reference to an express or implied acquiescence on the part of City officials in the suburban livery companies' actions in permitting certain city liveries to use the booths does not alter this court's ruling above that there is no genuine issue as to a conspiracy to violate the plaintiffs' constitutional rights. As the plaintiffs themselves argue, their equal protection theory focuses on their exclusion from the booths. The agreement referred to here is an agreement to allow the suburban-affiliated city liveries to use the booths, not an agreement to exclude the plaintiffs' from doing so. Proof that the suburban liveries acted with the City's approval in allowing suburban-affiliated city liveries to use

the booths would show that the *City* was enforcing its ordinance in a discriminatory fashion, *see Adickes v. Kress & Co.,* 398 U.S. 144, 166–68, 90 S.Ct. 1598, 1613–1614, 26 L.Ed.2d 142 (1970), but it would in no way implicate the suburban livery companies in a conspiracy to exclude the city liveries, action that was mandated by City law. And the plaintiffs have neither alleged nor sought to prove that the suburban livery companies were state actors, and thus subject to constitutional constraints, simply by virtue of their right to use the livery dispatch booths. *See Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) (private club with state liquor license not state actor).

## CONCLUSION

The defendants' motions for summary judgment on Count II are granted. The City's motion for summary judgment on Count I is granted on the due process claim but denied on the equal protection claim. The plaintiffs' motions for partial summary judgment on Count I are denied. The City's motion in limine with respect to the plaintiffs' new theory of damages is denied. The City's motion for judgment on the pleadings and the plaintiffs' motion in limine for collateral estoppel are dismissed as moot.