**PONTARELLI LIMOUSINE, INC., et al., Plaintiffs,**

v.

**CITY OF CHICAGO, et al., Defendants.**

**No. 83 C 6716.**

United States District Court, N.D. Illinois, E.D.

March 22, 1990.

Charles Pressman, P.C., Charles Pressman and Bertrand A. Rice, Chicago, Ill., for plaintiffs.

Dan Brusslan, Morris G. Dyner, Paul D. Streicher and Joel Miller, Fischel & Kahn, Marc Chalfen, Randolph Ruff and William Raleigh, DeHaan & Richter, Wm. Carlisle Herbert, Hopkins & Sutter, and Jeremiah Marsh, Gordon B. Nash, Jr. and Deborah

H. Bornstein, Gardner, Carton & Douglas, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

On October 2, 1989, a jury reached a verdict against the City of Chicago and in favor of the ten plaintiffs in this suit, which the court described in *Pontarelli Limousine, Inc. v. City of Chicago,* 704 F.Supp. 1503 (N.D.Ill.1989). The City has moved for judgment notwithstanding that verdict pursuant to Rule 50(b), Fed.R.Civ. Pro., and renews in it the grounds which it set forth in two previous motions for directed verdict under Rule 50(a). Pursuant to Rule 59(e), the City also has moved to amend the judgment by reducing the jury's awards to three of the plaintiffs, Metropolitan Limousine, Inc., Carey of Chicago, and Pontarelli Limousine, Inc. For their part, the plaintiffs have moved for a new trial under Rule 59(a) for a new trial on damages issues, and for attorneys fees and costs.

The parties agree that in considering the City's motion for judgment notwithstanding the verdict, this court must "look at the evidence in a light which is most favorable" to the plaintiffs, "and determine whether the evidence, combined with all reasonable inferences which may be derived therefrom, supports the jury's verdict. The question is 'not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'" *David Copperfield's Disappearing, Inc., v. Haddon Advertising Agency, Inc.,* 897 F.2d 288, 291 (7th Cir.1990) (citations omitted; emphasis in original), quoting *Gunning v. Cooley,* 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720 (1930). See also *Goldman v. Fadell,* 844 F.2d 1297, 1300 (7th Cir.1988).

As explained in this court's earlier opinion, the plaintiffs sued the City under 42 U.S.C. § 1983 (1982). At trial they contended that the City denied them equal protection of the laws in violation of the Fourteenth Amendment to the Constitution by preventing them from using livery dispatch booths at O'Hare International Airport. In order to recover from the City under § 1983, the plaintiffs had to prove at trial "that the City, through its officials in positions of policy-making authority, consciously administered the livery dispatch system so as to discriminate against them." *Pontarelli,* 704 F.Supp. at 1517.

From the evidence presented at trial, a jury could not reasonably conclude that the plaintiffs proved two aspects of their case. For this reason, the court must enter judgment in favor of the City and against the plaintiffs. First, the plaintiffs presented no evidence from which a jury reasonably could infer that the City consciously discriminated against the plaintiffs in administering its livery dispatch system. The plaintiffs conceded that the City had no official policy condoning discrimination against them. They thus bore the burden of proving that City officials knew of and acquiesced in a long-standing practice or custom of discrimination against the plaintiffs. To carry this burden, the plaintiffs had to demonstrate two things. They first had to identify which City official had "final policymaking authority" over the livery booths. This question is one of law. Second, they had to prove that this official acquiesced in discrimination against the plaintiffs, so as to make discrimination the "standard operating procedure" of the City. This question is one of fact. See *Jett v. Dallas Independent School Dist.,* — U.S. ——, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989).

As a matter of law, and according to the stipulations of the parties, the City official with authority over the O'Hare livery booths was the City's Commissioner of Aviation. The plaintiffs put forth no evidence, however, from which a jury reasonably could have concluded that the Commissioner acquiesced in discriminatory exclusions of the plaintiffs from the booths. The Commissioner first learned that some City-licensed liveries which served Chicago were using the booths in early 1979. The commissioner at the time, J. Patrick Dunne,

responded by issuing a letter condemning the practice and directing the police to halt all City-licensed liveries from dispatching from the booths.

The plaintiffs submit that notwithstanding Dunne's instructions, an administrative assistant in the Aviation Department, Thomas Jaconetty, learned of police reluctance to enforce Dunne's policy in February 1979. Even if Dunne himself heard of this reluctance—there is no evidence that he did—a memorandum written by Jaconetty which describes police reaction to Dunne's directive notes in clear terms that Jaconetty told the police to enforce the law. The jury heard no evidence from which it could reasonably infer that Dunne understood that discrimination continued notwithstanding his directive and Jaconetty's discussions with the police, or that Dunne acquiesced in discrimination.[1]

Thus, as of Dunne's letter in 1979, the City's policy—both officially and by way of customs known to the Commissioner—was against the practices which Dunne condemned in his letter. Dunne's successor, Thomas Kapsalis, did not amend this policy until 1982. The jury heard no evidence that Kapsalis knew of practices contrary to Dunne's order prior to becoming Commissioner in September 1980 until January 1982. In January, the Circuit Court of Cook County ordered changes in livery operations at O'Hare. In response to this order, Commissioner Kapsalis directed that limousine companies serving Chicago—he made no distinction between those licensed by the City and those licensed by suburban municipalities—could share the O'Hare dispatch booths.

On January 20, 1982, Robert Cusumano, the First Deputy Commissioner of Aviation, and William Corbett, Cusumano's subordinate, spoke at a meeting of livery operators, shortly after Kapsalis had changed the City's policies about the O'Hare booths. It is undisputed that Cusumano told everyone present that livery operators would be treated equally, consistent with Commissioner Kapsalis's policy. Cusumano then left the meeting, leaving Corbett—a person who, by law, could not make City policies over the O'Hare booths. Corbett described the City's "policy" differently from Cusumano. Corbett told the livery operators that only the plaintiffs who had prevailed in the Circuit Court could use the booths. All other City-licensed liveries who served Chicago, Corbett told the group, would have to sue to gain entry to the booths.

Corbett's statement is the only evidence that a City official believed there was a distinction between City- and suburban-licensed liveries who served Chicago for purposes of operating out of the O'Hare dispatch booths. This official had no authority to make City policy over the booths. The plaintiffs introduced no evidence from which a jury reasonably could infer that the one official who had authority to make policies for the booths, Commissioner Kapsalis, knew of and acquiesced in Corbett's characterization of City policy as of and after January 20, 1982, until the City halted booth operations in 1986.

The plaintiffs thus have failed to introduce evidence from which any jury reasonably could conclude that the City's policy was to discriminate against the plaintiffs. Even if the plaintiffs had introduced sufficient evidence on this point, however, they still would have failed to prove that this discrimination violated the plaintiffs' constitutional right to equal protection of the laws. As this court stated in its prior opinion, the court starts from the presumption that the City's regulations are valid, and the court must sustain them if the

---

1. The plaintiffs suggest that were this court to find that the City avoids liability for discrimination based on Dunne's conduct, the court would be allowing City officials to stick their heads in the sand with impunity. The plaintiffs exaggerate the consequences of this court's decision. Had City employees continued discriminating against the plaintiffs in violation of the Fourteenth Amendment and the City's official policies, the plaintiffs could have sued those employees. Success in such a suit would be incentive enough for City employees to pay attention. The plaintiffs' error is that they try to impute employee misconduct to the City itself. This merely is an attempt to use the theory of respondeat superior, which is not a way to hold a municipality liable under § 1983. See *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978).

City's distinctions among livery operators are rationally related to the City's legitimate interests. See *Pontarelli*, 704 F.Supp. at 1515. If the court can hypothesize plausible reasons for a regulation which are within the legitimate goals of a government, "nothing else is required to validate the governmental classification...." *Evans v. City of Chicago*, 873 F.2d 1007, 1016 (7th Cir.1989).

The plaintiffs originally argued that the City made numerous distinctions among livery operators which violated the law. The only one of these classifications left for trial was the City's alleged distinction after 1977 between suburban-licensed liveries which served Chicago and City-licensed liveries which served the same area.[2] See *Pontarelli*, 704 F.Supp. at 1517. The uncontradicted evidence from trial indicates that the distinction is the result of other, lawful classifications among livery drivers. As the evidence at trial showed and as this court has previously held, the City legitimately could distinguish between suburban and City-licensed liveries. The City learned from a study commissioned by it in 1973 that livery companies serving the suburbs (which, as a result of the City's licensing practices, could not be City-licensed companies, see *id.*) were responsible in large part for livery-related traffic congestion and illegal solicitation at O'Hare. In keeping with its legitimate interests in reducing this congestion and solicitation, the City rationally could have ordered the suburban services to operate out of booths.

The booths themselves were a problem. Some in the City regarded them as slovenly and undesirable. Livery companies hawked their services to arriving passengers, sometimes in ways that were offensive. Operators also fought among themselves for business. In keeping with legitimate aesthetic concerns, the City rationally could have chosen to limit booth opera-

tions to the extent necessary to solve its traffic and solicitation problems. The City could have felt that City-licensed companies did not contribute substantially to the traffic and solicitation problems, and that the trouble accompanying booths for City-licensed companies would outweigh any gains in smoother traffic flow. City-licensed companies also were free to arrange with suburban liveries or join two suburban-dominated trade associations, the Northern Illinois Livery Owners Association and the Midwest Livery Association, to dispatch City-bound liveries from their positions at the booths. The City thus could have rationally decided not to provide or allow booths for City-licensed liveries.

Things changed in January 1982, when it is undisputed that the City allowed the City-licensed companies who had prevailed in the Circuit Court to use the booths. The City rationally could have decided to adhere to its earlier policy, that of not having booths for companies not serving the suburbs, while making an exception for those companies which had prevailed in the Circuit Court of Cook County. This compromise would have allowed the City to achieve the optimal balance of its interests in having as few booths as possible and avoiding trouble with the state court. While the plaintiffs here may disagree with the wisdom of this compromise, the possibility of a "wiser" economic or social alternatives does not make a municipality's chosen policy illegal under the Fourteenth Amendment, unless the chosen policy is arbitrary or irrational. See *id.*

In essence, the court holds that even if it was City policy after 1982 to let the plaintiffs sue to have booths at O'Hare, such a policy would not have violated the Fourteenth Amendment. Such a policy may have indicated disagreement with the Circuit Court's order, but the Equal Protection Clause of the Fourteenth Amendment does

---

**2.** The only reason this distinction was left for trial was that the City failed to give any rationale for the distinction in proceedings on the parties' motions for summary judgment. See *Pontarelli*, 704 F.Supp. at 1517. Had the City presented these justifications at that time, the court need not have held trial, for the question of whether a distinction is rationally related to a municipality's legitimate interest is one of law, not fact. See *Evans*, 873 F.2d at 1016 (distinction valid for any plausible reason within the legitimate goals of government, even if that reason did not actually motivate the distinction).

786

not prevent a municipality from defending a social or economic policy which is rationally related to its legitimate interests— even if such a defense goes against the spirit of a court's decision.

The court thus must enter judgment in favor of the City, notwithstanding the jury's verdict in this matter. The court will dismiss the parties' remaining motions as moot. The court should note, however, that even if the City had violated the plaintiffs' right to equal protection of the laws, the court would be compelled to award only nominal damages.[3] This is because the plaintiffs employed damages theories which had gross errors. The plaintiffs first presented the jury with a so-called "deadhead" calculation, an estimate of the savings to the plaintiffs had they been able to fill their vehicles as they left O'Hare. The flaw in this calculation was that it was not based on the actual experiences of the plaintiffs or of booth operators. This flaw forced the jury to speculate about the plaintiffs' actual numbers of deadheads and the degree to which operating in the booths would have reduced their losses from deadheads. Moreover, the deadhead calculation did not account for the competition among the plaintiffs that would have ensued had the plaintiffs had booths at O'Hare. Taken together, these flaws rendered the plaintiffs' presentation on deadheads worthless.

The second theory which the plaintiffs presented to the jury concerned general lost opportunities from not operating out of the O'Hare booths. The plaintiffs rested this theory on evidence that liveries serving the City which operated out of the booths had 68.9% more mileage than the plaintiffs' vehicles. The plaintiffs suggested that had they operated out of the booths, they would have recognized similar success. The flaw in this reasoning is patent: it is unrealistic. Allowing the plaintiffs to operate out of the booths might have increased the supply of liveries at O'Hare, but the plaintiffs submitted no evidence that demand would rise correspondingly. It is more plausible that the plaintiffs would have competed against one another. This would have resulted in substantially less of an increase in passenger miles than 68.9%, lower revenues per mile (as passengers took advantage of greater competition), or both.

In sum, the plaintiffs' damages theories lacked foundation in the evidence and allowed the jury to speculate unreasonably. Nominal damages along the lines awarded to seven of the plaintiffs would have been appropriate in this case, but the plaintiffs did not demonstrate their entitlement to anything more. See *Ustrak v. Fairman*, 781 F.2d 573, 578–80 (7th Cir.1986) ("damages, like every other contested element of a plaintiff's case, must be proved in order to be recovered"; jury not allowed "to speculate in a void.").

The court enters judgment in favor of the City of Chicago, notwithstanding the verdict in favor of the plaintiffs. The court denies all other motions as moot.

3. The jury awarded damages as follows:

| | | |
|---|---|---|
| Ambassador Limousine | $ | 1.00 |
| Sullivan & Son, Inc. | | 1.00 |
| Salerno Limousine Service, Inc. | | 1.00 |
| Roberta Executive Limousine | | 1.00 |
| Metropolitan Limousine, Inc. | | 257,436.00 |
| R & R Limousine Service, Inc. | | 1.00 |
| Centennial Custom Limousine | | 1.00 |
| Carey of Chicago | | 126,480.00 |
| Class A Limousine Service, Inc. | | 1.00 |
| Pontarelli Limousine, Inc. | | 57,601.00 |