Jusein MUSTFOV, Ray Mohyde, Henry Sammarco, Dennis Becker, Miodrag Stojadinovich, Dragan Petrovic, Randall Schlicter, John A. Lindsey, Jim Guthrie, Lawrence Frowick, Frank Barberis, Neb Tarailo, Wilfred Brodeur, Donald Gardella, John Miller, Ivan Nikolov, Ronald Courtney, Ace Limousine, Inc., William Pascente, Jeanette Olivo, Santos Gonzales, Donald F. Piencak, Anthony Palermo, Dennis Cooper, Christopher Frowick, Adventure Limousine, Inc. and All Suburban Limousine Services, Inc., Plaintiffs,

v.

SUPERINTENDENT OF CHICAGO POLICE DEPARTMENT; Commander of Police for O'Hare International Airport; Vehicle Commissioner Consumer Service Department; Deputy Commissioners; Chicago Corporation Counsel; the City of Chicago; Paul Jankowski, individually; and Dan Welter, individually, Defendants.

No. 86 C 3905.

United States District Court,
N.D. Illinois, E.D.

Feb. 20, 1990.

Michael Smith, Schaumburg, Ill., for plaintiffs.

Diane Larsen, Asst. Corp. Counsel, Litigation Div., and Albert Maule, Christopher W. Zibart and E. Glenn Rippie, Hopkins and Sutter, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This twelve-count action was brought under 42 U.S.C. § 1983 ("Section 1983") by a group of individual livery and taxicab operators and three corporate livery services against the City of Chicago, and against the Superintendent of the Chicago Police Department and the Commander of Police for the 16th Police District in their official capacities. (Defendants collectively referred to as "City"). The plaintiffs challenge various ordinances and alleged City practices regulating or affecting livery operations in Chicago and particularly at Chicago's airports. The parties have filed cross-motions for summary judgment as to all matters not previously dismissed or settled.[1]

### I. Summary of the Plaintiffs Remaining Claims

The plaintiffs state five classes of claims in their complaint. First, they raise facial constitutional challenges to the City's Anti–Solicitation and Inter–Urban Operation Ordinances, found in Chapter 28 of the Chicago Municipal Code, "Public Passenger Vehicles." Various plaintiffs seek damages and declaratory relief on the claim that the ordinances violate the Due Process Clause because they are unconstitutionally vague (Counts II and III).[2] Various plaintiffs

---

1. On Nov. 11, 1988, the plaintiffs voluntarily dismissed Count XI of their amended complaint, and dismissed all claims against Asst. Dep. Supt. Jankowski and former Asst. Corp. Counsel Welter in their individual capacities. We recently dismissed plaintiff Miller with prejudice. *See* Order of July 5, 1989. Various of the plaintiffs were dismissed or settled in accordance with our Orders of July 6, 1989 and October 4, 1989.

2. Mustfov, Nikolov, Ace Limousine ("Ace") and Adventure Limousine ("Adventure") seek both damages and declaratory relief. Although the damage claims of Lindsey, Courtney, Olivo, and

seek damages and all of the plaintiffs seek declaratory relief on the claim that prohibiting solicitation of passengers for livery trips, and not for certain other modes of transportation, violates the Equal Protection Clause (Count IV).[3] Some plaintiffs seek damages and all of the plaintiffs seek declaratory relief on the claim that preventing unlicensed vehicles from travelling between O'Hare and the rest of Chicago violates the Interstate Commerce Clause (Count IX).[4]

Second, certain plaintiffs seek damages and all of the plaintiffs seek declaratory and injunctive relief on the claim that the City's restrictions on the number of livery vehicles it licenses, and its distribution of those licenses, violates the Equal Protection and Due Process Clauses (Count VI).[5]

Third, all of the plaintiffs seek damages and declaratory and injunctive relief on the claim that the City removed the name, address, and telephone number of one of the livery companies in violation of the Due Process Clause (Count XII).

Fourth, certain plaintiffs seek damages and all of the plaintiffs seek declaratory relief on a claim attacking the validity of the City's annexation of land encompassing O'Hare ("O'Hare Area").[6] They contend that if the O'Hare Area was not validly annexed, then the City regulation and policing of ground transportation there violates the Due Process Clause (Count VIII).

Fifth, various plaintiffs raise claims challenging the City's enforcement of the ordinances. They seek damages and declaratory and injunctive relief, claiming that

(1) their arrest for violating the ordinances and the incident processing violate the Fourth Amendment and Due Process Clause, both because the City cannot lawfully arrest violators of the ordinances and because their post-arrest processing, in several instances, was too slow (Count X);[7]

(2) they are arrested for violating the ordinances without probable cause or in an arbitrary and capricious manner in violation of the Due Process Clause (Count I);[8]

(3) the City enforces the ordinances differently at O'Hare and Midway Airport ("Midway") in violation of the Equal Protection Clause (Count V);[9]

(4) City officials conspired to detain various plaintiffs needlessly for long periods of time for processing in violation of the Due Process Clause (Count VII);[10]

In addition to challenging the substantive merits of each of these claims, the City raises several preliminary matters for our consideration. The City has moved to strike certain exhibits submitted by the plaintiffs in connection with their motion for summary judgment, and also points to the plaintiffs' failure to submit 12($l$) and 12(m) statements. The City also contends that many of the plaintiffs' claims are barred by res judicata. We will first address these preliminary matters, and then separately address each of the plaintiff's claims and the additional facts and arguments relating to each claim.

## II. Motion to Strike and Compliance with Local Rules

■ In responding to a motion for summary judgment, the plaintiffs must submit competent and proper evidence. Testimony must be based on personal knowledge and must set forth the facts in a manner that

Gonzales were dismissed, they continue to seek declaratory relief.

**3.** Mustfov, Lindsey, Nikolov, Courtney, Olivo, Gonzales, Ace and Adventure maintain the damage claims.

**4.** Mustfov, Nikolov, Ace and Adventure maintain the damage claims.

**5.** Mustfov, Lindsey, Nikolov, Courtney, Olivo, Gonzales, Ace and Adventure maintain the damage claims.

**6.** Mustfov, Lindsey, Nikolov, Courtney, Olivo, Gonzales, Ace and Adventure.

**7.** Mustfov, Nikolov, Ace and Adventure.

**8.** Mustfov, Nikolov, Ace and Adventure.

**9.** Mustfov, Nikolov, Ace and Adventure seek both damages and declaratory relief. Lindsey, Olivo and Gonzales have claims only for declaratory relief.

**10.** Mustfov, Nikolov, Ace and Adventure.

would be admissible in evidence. Fed.R. Civ.P. 56(e); *Davis v. City of Chicago*, 841 F.2d 186, 188 (7th Cir.1988). Documentary evidence likewise must be admissible and authenticated. *See, e.g., Wells v. Franzen*, 777 F.2d 1258, 1262 (7th Cir.1985). The City contends that the majority of the plaintiff's documentary and testimonial submissions fail to meet these standards.

The City has moved to strike portions of Mustfov's deposition testimony, found in Exhibits 5 and 7 ("P.Exs.") to the plaintiffs' motion for summary judgment, on the ground that they are rife with hearsay, speculation, and conclusory matter. The plaintiffs completely miss the mark in responding to these grounds. They fail to address the specific question whether the contested testimony is admissible and instead raise arguments concerning the use, as a general matter, of deposition testimony on a motion for summary judgment. Having reviewed the testimony we agree that P.Ex. 5, at 137:1–6 and 11–19, concerning detention, and P.Ex. 5, at 55:16–21, concerning an arrest of John Miller, contain inadmissible hearsay and speculation and are hereby stricken. That portion of P.Ex. 7, at 113, regarding a supposed bombing and P.Ex. 7, at 59, regarding the post-arrest processing at Midway is based on hearsay and speculation and hereby stricken. We do not strike the testimony in P.Ex. 7 relating to the livery booths and road construction as that testimony appears to be based on personal knowledge and is material to the plaintiffs' claim that the City no longer has a rational basis for only allowing the solicitation of passengers by Continental Limousine at O'Hare.

■ The City has further moved to strike certain documentary exhibits, P.Exs. 9–17, on the grounds they each are unauthenticated or otherwise inadmissible. The plaintiffs raise no objection to striking P.Exs. 10 and 12, and accordingly those exhibits are stricken. As to the remaining contested exhibits, here too the plaintiffs miss the mark and fail to address the specific questions of authenticity and admissibility. Regarding P.Exs. 11 and 13–17, the plaintiffs assert that these exhibits "can be authenticated by occurrence witnesses at trial." Authentication at that time, however, comes too late. Exhibits that the plaintiffs wish to use now, at the summary judgment stage, must be authenticated now. *Wells*, 777 F.2d at 1262 (7th Cir. 1985). Because the plaintiffs have failed to authenticate these exhibits, we find that they should be excluded. Similarly, we also find that P.Ex. 9 should be excluded because a properly authenticated and unaltered copy of the exhibit has already been submitted as City Ex. CC.

We now turn to the plaintiffs' failure to comply with Local Rule 12. First, the plaintiffs did not file a Rule 12(m) statement in response to the City's Rule 12(*l*) statement of uncontested facts filed with its motion for summary judgment. Consistent with Rule 12(m), we accordingly will deem the facts set forth in the City's Rule 12(*l*) statement as admitted. Second, the plaintiffs did not file a Rule 12(*l*) statement with their motion for summary judgment. Rule 12(*l*) provides that failure to submit such a statement constitutes grounds for denial of the motion. The parties, however, have filed cross motions for summary judgment and, in conjunction with those motions, have allotted a joint statement of stipulated facts and joint exhibits. Therefore, there exists a record of material facts as to which there is no dispute and accordingly the spirit, if not the form, of Rule 12(*l*) has been satisfied to the extent that plaintiffs may rely on the stipulated facts in their motion for summary judgment. Further, as to those additional exhibits upon which the plaintiffs now intend to rely in their motion, the plaintiffs did make specific reference to them in the text of their memorandum. While that does not excuse the plaintiffs' technical lack of compliance, and obviously made the job of sorting out the plaintiffs' motion more difficult for both the City and this Court, we observe that it is the plaintiffs who ultimately will have been prejudiced by the confusion engendered by their lack of compliance with the local rule. In any event, the plaintiffs' motion for summary judgment simply reiterates some of the arguments they already raised in re-

sponse to the City's motion. Thus, we proceed to the merits of the combined motions.

## III. Res Judicata

Each individual plaintiff has been convicted for violating the Anti–Solicitation and Inter–Urban Operation Ordinances in quasi-criminal proceedings brought by the City in the Circuit Court of Cook County. Most have been arrested scores, and a few, even hundreds of times. No plaintiff has ever appealed his conviction. The City contends that the doctrine of res judicata bars the plaintiffs from raising a Section 1983 challenge to the propriety of their past prosecutions based on both the facial attack on constitutionality of the ordinances (Counts II, III, IV and IX) and on allegations of arrest without probable cause or entrapment (Counts II and VII).[11] The City characterizes these claims as impermissible collateral attacks on the Illinois state court convictions.

A federal court in a Section 1983 action must give the same preclusive effect to a state court ruling as would the rendering state. *Donald v. Polk County,* 836 F.2d 376 (7th Cir.1988); 28 U.S.C. § 1738. In *Mustfov v. Superintendent of Police,* 663 F.Supp. 1255, 1260 (N.D.Ill.1987) (*"Mustfov I"*), we determined that, according to 28 U.S.C. § 1738, Illinois law controls the application of res judicata in this case. Under Illinois law, a final judgment on the merits in Illinois is conclusive on all subsequent suits upon the same cause of action and between the same parties, and extends not only to the questions actually litigated and decided, but to all grounds of recovery or defenses that might have been presented in the prior proceeding. *Id.* Because the earlier state actions in this case were either criminal or quasi-criminal, and not civil actions, we are not concerned with claims that the plaintiffs might have presented, but rather with defenses to their prosecutions that they might have presented. *Id.* Accordingly, res judicata will apply "when a party seeks to raise a constitutional challenge in a federal civil rights action which could have been, but was not, raised as a defense in prior state proceedings." *Pliska v. Stevens Point,* 823 F.2d 1168, 1172 (7th Cir.1987); *Button v. Harden,* 814 F.2d 382, 384 (7th Cir.1987).[12]

The City argues that the plaintiffs certainly could have raised their constitutional challenges to the ordinances and the propriety of the prosecutions as a means of defending the actions in the state court proceedings. State court jurisdiction to hear such arguments is well established. *See Horn v. City of Chicago,* 860 F.2d 700, 702 n. 5 (7th Cir.1988).

11. The City employs the term res judicata in the narrow sense of claim preclusion, which is to be distinguished from the related concept of collateral estoppel, or issue preclusion. Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that has never been litigated, because of a determination that it should have been advanced in an earlier suit. Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided. *See Migra v. Warren City School Dist. Bd. of Educ.,* 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 894 n. 1, 79 L.Ed.2d 56 (1984). Although at times the doctrine of res judicata has been analyzed to consist of both the claim preclusion and issue preclusion concepts, *id.,* we will refer to res judicata and claim preclusion as synonymous and distinct from collateral estoppel and issue preclusion.

We note that the City has not argued res judicata as a defense to the plaintiffs' allegations that they have been detained for unconstitutionally excessive periods of time for post-arrest processing (Counts VII and X).

12. *Compare, Davis v. Charleston,* 827 F.2d 317 (8th Cir.1987). In *Davis,* the Eighth Circuit determined that the issue of guilt or innocence at trial is not "identical" to a Section 1983 claim for unlawful arrest by reason of absence of probable cause. Thus, the court held that the plaintiff's Section 1983 claim was not barred by the doctrine of collateral estoppel where the plaintiff was previously convicted in state court on charges of disturbing the peace. *Id.* at 321 n. 3. The court, however, did not consider the significance of the doctrine of res judicata to the plaintiff's claim. *Cf. also, Smith v. Springer,* 859 F.2d 31, 34 (7th Cir.1988) (plaintiff's § 1983 action against police officers, alleging that officers had fabricated evidence leading to his false arrest and subsequent unreasonable seizure, was not a collateral attack on his prior conviction for rape, but rather a separate claim for damages). In *Smith,* as in *Davis,* the applicability and significance of the doctrine of res judicata was not addressed, even though a challenge to the activity giving rise to the Section 1983 claim could have been raised during the prior criminal proceedings.

The plaintiffs assert, however, that circumstances excuse their failure to raise their constitutional defenses. The plaintiffs contend that they were denied a full and fair opportunity to litigate the constitutionality of the ordinances in the state courts both because the court was ill-equipped to handle the "complex issues involved" and because the process put undue influence on the plaintiffs to plea bargain. P.Resp. at 1.

The first point, regarding the competence of the court to hear the plaintiffs' challenges, pertains to those instances in which the plaintiffs plead not guilty, were tried, and a conviction was obtained based upon a verdict. The plaintiffs dwell on the fact that their cases were tried in traffic court instead of municipal district misdemeanor and ordinance violation courtrooms. However, prosecutions apparently have not been decided by traffic courts since 1984. The parties have stipulated that in March 1984, the City changed its arrest procedures and arranged to have all livery cases tried in municipal misdemeanor and ordinance courts. J. Fact Nos. 3.9, 3.12. Thus, we must consider this challenge in the two different contexts of traffic and misdemeanor courts.

■ Regarding the trials that occurred in traffic court, Illinois has a general rule regarding the effect of traffic court convictions upon later civil actions which we must take into account. In *Hengels v. Gilski*, 127 Ill.App.3d 894, 83 Ill.Dec. 101, 469 N.E.2d 708 (1st Dist.1984), the Illinois Appellate Court held that a traffic court conviction following a plea of not guilty does not possess adequate assurances of reliability necessary to justify its admission into evidence at a later civil trial based upon the same facts.[13] Noting that this is a special exception to the general rule otherwise allowing evidence of a prior criminal conviction as *prima facie* evidence of the facts upon which the conviction was based, the court reasoned:

A traffic court conviction will often result from expediency, convenience, and compromise; the constitutional safeguards are often perfunctory and the defendant's opportunity and motive to defend vigorously are often lacking. [To find such evidence of a conviction admissible] could conceivably turn a mechanical and summary traffic court hearing into the cornerstone of a significant civil action filed after the conclusion of the criminal proceedings.

*Id.* 127 Ill.App.3d at 910, 83 Ill.Dec. at 114, 469 N.E.2d at 721. *See also, Wine v. Bauerfreund*, 155 Ill.App.3d 19, 107 Ill. Dec. 491, 507 N.E.2d 155 (1st Dist.1987). Thus, not only do the Illinois courts refuse to give preclusive effect to traffic court convictions following pleas of not guilty, they also generally exclude the convictions even as evidence tending to establish the facts upon which the convictions were based. *Cf. Wine*, 155 Ill.App.3d at 27–28, 107 Ill.Dec. at 495–96, 507 N.E.2d at 159–60 (the admission of such evidence is not on its face grounds for reversal in all cases). Accordingly, we will not apply res judicata to bar the plaintiffs' claims, if any, based upon the convictions obtained after trial in traffic court.

■ Regarding any convictions that were obtained after trial in the misdemeanor court, we observe that a refusal to apply preclusion doctrine is appropriate only if we have serious doubts as to the fairness, quality, or extensiveness of the earlier proceedings. *Kunzelman v. Thomas*, 799 F.2d 1172, 1176 (7th Cir.1986). There is nothing in the record before us that suggests that the procedures or practice of the court system were even remotely inadequate for consideration of the constitutional challenges to the ordinances which that system enforces, or for consideration of matters relating to probable cause and entrapment. Moreover, it is undisputed that not a single plaintiff has ever appealed his or her conviction. As the City points out, the plaintiffs surely do not suggest that the Illinois Appellate Court and the Illinois

---

**13.** *Hengels* involved a personal injury action arising from an automobile accident for which the defendant had earlier been convicted following a plea of not guilty under the "hit and run" provisions of the Illinois vehicle code.

Supreme Court are incapable of deciding complex or constitutional arguments.[14] Nor do we believe that the state misdemeanor trial courts are incapable of adequately adjudicating such motions. Section 1983 "cannot be used as a vehicle for collaterally attacking a criminal conviction and thereby circumventing the requirement of exhausting state remedies before turning to federal court for post-conviction relief." *See Mann v. Hendrian,* 871 F.2d 51 (7th Cir.1989). The plaintiffs are therefore barred from now seeking damages on the ground that the past convictions based upon verdicts of guilt after trial in the misdemeanor court were unconstitutionally obtained.

■ Plaintiffs' second point, that the process placed undue influence on them to plea bargain, pertains to those situations in which the plaintiffs were convicted upon guilty pleas. Even assuming, without deciding, that the allegations that the pleas were coerced would excuse the failure to raise constitutional challenges, the plaintiffs have failed to present any evidence of such coercion. The only evidence to which the plaintiffs refer in their response is alleged testimony by Mustfov that purports to show that officers engaged in a pattern of pressure and threats to make the plaintiffs plead guilty or face a high fine and that such conduct made the pleas involuntary and the product of coercion. That testimony, however, is nowhere to be found in any of the exhibits to the motions. Thus, the plaintiffs have failed to meet their burden on this point as well. *Cf. Rodriguez v. Schweiger,* 796 F.2d 930, 933–34 (7th Cir.1986), *cert. denied* 481 U.S. 1018, 107 S.Ct. 1899, 95 L.Ed.2d 506 (1987) (plaintiff failed to substantiate any facts that were unavailable or unknown to him showing that the police reports that influenced his decision to plead guilty contained false information and misstatements of fact).

Nevertheless, the guilty pleas, regardless of whether they were coerced, are significant to the issue of claim preclusion for another reason. In *Haring v. Prosise,* 462 U.S. 306, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983), the Supreme Court ruled that principles of collateral estoppel may not bar one who has pleaded guilty in a criminal proceeding from suing for damages under Section 1983 for an alleged Fourth Amendment violation. In *Haring,* Franklin Prosise had plead guilty before a Virginia trial court to one count of manufacturing a controlled substance. Prosise subsequently brought a Section 1983 damages action in federal court against several police officers alleging that the officers had unlawfully searched his apartment prior to obtaining a search warrant, and that after obtaining the warrant the officers conducted a search that exceeded the scope of the warrant.

*Haring* first addressed the question whether the Virginia courts would invoke the doctrine of collateral estoppel to preclude litigation concerning the legality of the search of Prosise's apartment. The court determined that "unless an issue was actually litigated and determined in the former judicial proceeding, Virginia will not treat it as final." *Id.* 462 U.S. at 315, 103 S.Ct. at 2374. The court determined that the only issue actually litigated and decided as a result of the guilty plea was the question whether Prosise had unlawfully engaged in the manufacture of a controlled substance. Because the Virginia law of collateral estoppel is the same as Illinois' then, had collateral estoppel been the doctrine with which we were concerned here, then this aspect of the *Haring* decision would control.

---

14. There appears to be some confusion regarding which party bears the burden proof on the issue of preclusion. In *Jones v. City of Alton,* 757 F.2d 878 (7th Cir.1985), the court determined that under Illinois law, the party asserting the preclusion bears the burden of showing with clarity and certainty what was or could have been determined in the prior proceeding. In a subsequent case, however, the Seventh Circuit noted that the party against whom preclusion was asserted bears the burden of showing that they were unable to present their constitutional claims in the earlier proceeding. *See Horn,* 860 F.2d at 702 n. 5. Nevertheless, even assuming that the City bears the burden in this case, we believe the City has prevailed on this particular issue.

The debate here, however, centers on res judicata and the preclusive effect of matters that could have been raised in the prior proceedings. *Haring* speaks to that issue as well. The court next considered an argument by the police officers that, even if Prosise's claim was not precluded under Section 1738, the court should create a special rule of preclusion which nevertheless would bar litigation of Prosise's Section 1983 claim. The officers presented what essentially was an argument that Prosise's claim should be barred by a rule of res judicata—claiming Prosise had an opportunity to raise the Fourth Amendment issue in the previous proceeding. Thus, the officers asked the court to create a federal rule of preclusion based on the fact that the issue could have been litigated and that, by pleading guilty, Prosise should be "deemed to have either admitted the legality of the search or waived any Fourth Amendment claim...." *Id.* at 318, 103 S.Ct. at 2375. The officers contended that such an omission or waiver should be inferred because Prosise had a substantial incentive to elect to go to trial if he considered his Fourth Amendment claim meritorious, since the State would most likely have been unable to obtain a conviction in the absence of the evidence seized from Prosise's apartment. *Id.* at 319, 103 S.Ct. at 2375–76.

The Court explicitly rejected those contentions on the ground that "it would be impermissible for a court to assume that a plea of guilty is based on the defendant's determination that he would be unable to prevail on a motion to suppress evidence." *Id.* at 318, 103 S.Ct. at 2375–76. The court then cited to the number of motivations that a defendant's decision to plead guilty may have. *See Brady v. United States*, 397 U.S. 742, 750, 90 S.Ct. 1463, 1470, 25 L.Ed.2d 747 (1970); *Tollett v. Henderson*, 411 U.S. 258, 263, 268, 93 S.Ct. 1602, 1606, 1608, 36 L.Ed.2d 235 (1973). Since a plea "represents a break in the chain of events [that] preceded it in the criminal process,"

*Tollett*, 411 U.S. at 267, 93 S.Ct. at 1608, such a conviction is based only on the plea itself, and not what has gone on before. *Haring*, 462 U.S. at 321, 103 S.Ct. at 2377. Thus, while a plea may operate as a waiver of constitutional trial rights, it does not bar review of any "antecedent Fourth Amendment claims that may be given effect outside the confines of the criminal proceeding." *Id.* Finally, the court concluded that

adoption of petitioners' rule of preclusion would threaten important interests in preserving federal courts as an available forum for the vindication of constitutional rights.... The rule would require "an otherwise unwilling party to try [Fourth Amendment] questions to the hilt" and prevail in state court "in order to [preserve] the mere possibility" of later bringing a § 1983 claim in federal court.

*Id.* at 322, 103 S.Ct. at 2378 (quoting *Brown v. Felson*, 442 U.S. 127, 135, 99 S.Ct. 2205, 2211, 60 L.Ed.2d 767 (1979)).

Although the court found "no justification for creating such an anomalous rule," *id.* 462 U.S. at 318, 103 S.Ct. at 2375, the court did not consider whether it would be bound to permit such an anomaly with respect to Fourth Amendment claims in the context of giving full faith and credit to a state rule of res judicata under Section 1738.[15]

Specifically with respect to evidentiary effect of guilty pleas, the Illinois Supreme Court has held that "a constitutional right, like any other right of an accused, may be waived, and a voluntary plea of guilty waives all errors or irregularities that are not jurisdictional." *DelVecchio v. Illinois*, 105 Ill.2d 414, 432–33, 86 Ill.Dec. 461, 470, 475 N.E.2d 840, 849, *cert. denied*, 474 U.S. 883, 106 S.Ct. 204, 88 L.Ed.2d 173 (1985) (quoting *People v. Brown*, 41 Ill.2d 503, 505, 244 N.E.2d 159, 160 (1969)). Thus, it would appear that issues deemed to be waived in accordance with this rule, including any antecedent Fourth Amendment claims, would likewise be barred from be-

---

**15.** The Virginia state law doctrine of res judicata was never raised in *Haring* because the police officers technically were not parties to the prior criminal proceeding. Hence there was not strict mutuality among the parties sufficient to invoke res judicata. *See Haring*, 462 U.S. at 316 n. 10, 103 S.Ct. at 2375 n. 10.

ing relitigated in later proceedings under the Illinois rule of res judicata.[16]

■ Nevertheless, we believe that the considerations espoused by the Supreme Court regarding guilty pleas weigh against giving full effect to the Illinois rule concerning waiver, at least insofar as that rule would operate to bar later litigation of Fourth Amendment violations as opposed to constitutional infirmities arising in the context of the actual plea proceedings. We find that these considerations amount to a legal determination that the process surrounding a guilty plea does not afford a defendant a "full and fair opportunity to litigate" the Fourth Amendment issues, and accordingly they constitutionally override the applicability of Section 1738, *see Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 480–82, 102 S.Ct. 1883, 1897–98, 72 L.Ed.2d 262 (1982). Although the plaintiffs, by pleading guilty, may have waived any claim for damages or declaratory relief based on their convictions under allegedly unconstitutional ordinances, the claims for damages resulting from the activity of officers alleged to have been violative of the Fourth Amendment and occurring prior to the plea proceedings will not be barred.[17] *Cf. O'Leary v. Luongo,* 692 F.Supp. 893, 903 (N.D.Ill.1988) (defendant's conviction for resisting arrest does not bar an excessive force claim arising out of the arrest).

■ Finally, we reiterate our holding in *Mustfov I,* that res judicata has no bearing on the plaintiffs' action insofar as it seeks prospective declaratory and injunctive relief regarding the constitutionality of fu-

**16.** We note, however, that while the holding in *DelVecchio* is stated in general terms, it only directly pertained to the question as to whether a trial court had erred in admitting evidence at a sentencing hearing of a defendant's allegedly involuntary confession. The court found that by pleading guilty without raising a challenge to the voluntariness, the defendant had waived the right to contest the voluntariness of the confession in the later proceeding. Thus the ruling was made in the context of proceedings in the same case.

**17.** This appears to be the result suggested, but left unresolved, by the Supreme Court in *Migra,* 465 U.S. at 85 n. 7, 104 S.Ct. at 899 n. 7. There the court ruled that a state rule of claim preclu-

ture enforcement and prosecution of the ordinances. The plaintiffs have demonstrated, and the City apparently concedes, that there exists a genuine threat of further prosecutions against the plaintiffs under the allegedly unconstitutional ordinances and that they possess a legitimate expectation that the allegedly unconstitutional procedures of enforcement will continue to be employed as well. Accordingly the plaintiffs have standing to bring their claims for declaratory and injunctive relief. *See Mustfov I,* 663 F.Supp. at 1259–60. *See also Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). We now turn to the merits of the plaintiffs' surviving claims.

## IV. Facial Challenges to the Ordinances

### A. *Void-for-Vagueness (Counts II and III)*

■ The plaintiffs seek relief on the grounds that the Anti–Solicitation and the Inter–Urban Operation Ordinances are unconstitutionally vague. The plaintiffs first claim that the word "solicit," as used in the Anti–Solicitation Ordinance, was so vague as to render Section 28–19.2 unconstitutional. That claims fails on the grounds of mootness, since on January 27, 1988, the City amended the ordinance by adding a separate definition of the word "solicit," to which the plaintiffs have raised no further contest. Summary judgment in favor of the City is therefore appropriate on this issue.

Plaintiffs next assert that the phrase "within the City," used in the Inter–Urban

sion is applicable to bar a Section 1983 action based on federal questions that could have been raised by a party in an earlier civil proceeding instituted by that party. The court, however, intimated that claim preclusion based on prior criminal proceedings may present a different issue on the ground that the plaintiffs to the Section 1983 action were compelled to be in state court by virtue of criminal proceedings and thus were robbed of the opportunity to have their constitutional claims heard in a federal forum. The question whether claim preclusive effect should be given to prior criminal proceedings was also left unresolved in *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

Operation Ordinances, is unconstitutionally vague when applied to transportation originating at O'Hare. The plaintiffs, however, have not pursued this claim in their motion for summary judgment. Nor have they responded to the City's contention in its own motion that the phrase "within the City" is hardly subject to differing interpretations. Both because of the plaintiffs' failure to offer any argument or evidence on this point, and because we agree with the City that there is no question of fact on this point, we grant summary judgment in favor of the City on this challenge.

## B. *Equal Protection (Count IV)*

■ The plaintiffs raise an equal protection challenge based on allegedly preferential treatment given by the City to Continental Bus Company. Under an exclusive arrangement, pursuant to authority granted by the Illinois Commerce Commission and a Chicago Ordinance approving the contract, the City allows Continental to operate a bus and van service and to solicit customers for transportation from the Midway and O'Hare airports to downtown Chicago locations.[18] The plaintiffs, by contrast, are not permitted to solicit customers and may not park outside the terminals "for a time longer than is reasonably necessary to accept passengers in answer to a call for service." City Ordinance § 28–19.2. The plaintiffs contend that this distinction between liveries and the bus system bears no rational relation to a legitimate governmental interest. We find, however, that based on the undisputed facts in this case the plaintiffs and Continental are not similarly situated and that the City has satisfactorily established a rational purpose for distinguishing between them and providing Continental with privileges unavailable to livery drivers at the airports. *See Mustfov I,* 663 F.Supp. at

1262–64; *Evans v. City of Chicago,* 873 F.2d 1007, 1015–16 (7th Cir.1989) ("governmental classification that does not affect a suspect class or fundamental right must be upheld unless no reasonably conceivable set of facts could establish a rational relationship between the classification and an arguably legitimate end of government").

Continental's bus service is sufficiently distinct from the livery services provided by the plaintiffs so as to justify different treatment regarding access to and operation at the airports. One of the reasons the City originally enacted the Anti–Solicitation Ordinance was that traffic congestion had become a major problem at O'Hare, and that a growing number of livery vehicles parking outside the terminals while their owners solicited passengers within the terminals was a substantial factor in this problem. *See Pontarelli Limousine, Inc. v. City of Chicago,* 704 F.Supp. 1503, 1506 (N.D.Ill.1989). The arrangement with Continental is consistent with those objectives. The buses that Continental operates run on specified routes to specified destinations, typically on a specified time schedule. While liveries are restricted to a maximum of eight passengers, the buses hold many more. A single bus takes up much less roadway space at a terminal than the passenger-equivalent number of liveries.[19] There are hundreds of licensed liveries. The plaintiffs have provided no evidence that current congestion levels at O'Hare do not warrant the continued existence of the arrangement between the City and Continental. In fact, the only evidence offered by the plaintiffs on the issue of congestion at O'Hare describes traffic conditions by 1986 as being particularly bad. *See P.Ex. 7 at 111.*

---

**18.** Without explaining the significance of the fact, the plaintiffs point out that neither the Anti–Solicitation nor the Inter–Urban Operation ordinances contain any exception that allows "public passenger vehicles" to solicit passengers and to transport them to downtown locations. Yet those two ordinances apparently do not apply to Continental by virtue of its exclusive arrangement with the City in accordance with a separate ordinance. We therefore regard the plaintiffs' argument as a facial attack on all

three ordinances, as opposed to an equal protection challenge based on a claim of selective enforcement of only the Anti–Solicitation and Inter–Urban Operation ordinances.

**19.** Further, it would appear that the set time schedules of operation also result in a greatly reduced amount of time in which a bus will be parked in front of the terminals.

In enacting the Anti–Solicitation Ordinance, the City also wanted to prevent livery operators from harassing travelers arriving at O'Hare. *Id.* Because of the exclusive grant to Continental and the close regulation of the bus service, the service does not present the harassment problem that hundreds of individual liveries present.

Thus, not only have the plaintiffs failed to provide any evidence showing that it is irrational to treat the buses and liveries differently, but the undisputed facts before us support the contrary proposition. Because of the characteristics of Continental's bus service described above, it is rational to conclude that Continental's operation presents much less of a regulatory concern than the livery services. Therefore, the City has sufficient reason to regulate Continental without the restrictions placed on liveries by the Anti–Solicitation Ordinance. Therefore, summary judgment in favor of the City is warranted on this claim.

### C. Commerce Clause (Count IX)

■ Plaintiffs next claim that the Ordinances interfere with their pre-arranged fares in violation of the Inter-state Commerce Clause.[20] In *Mustfov I*, 663 F.Supp. at 1278–79, we determined that nonpre-arranged fares do not come within the purview of interstate commerce, *Evanston Cab Co. v. City of Chicago*, 325 F.2d 907 (7th Cir.1963), *cert. denied*, 377 U.S. 943, 84 S.Ct. 1349, 12 L.Ed.2d 306 (1964). Therefore, the plaintiffs' claim is barred insofar as it seeks to invalidate the ordinances because the ordinances prohibit the plaintiffs from soliciting customers at the airports and prevent the plaintiffs from conveying passengers between destinations within the City. We further determined, however, that regulations affecting pre-arranged livery fares present the potential for interference with interstate commerce and that municipal conduct in enforcing

those regulations may rise to the level of an impermissible infringement on inter-state commerce. *Mustfov I*, 663 F.Supp. at 1279.

■ There is some debate between the parties as to whether the plaintiffs have satisfactorily established that they were in fact involved in interstate commerce. We need not resolve that issue, however, since the plaintiffs' Commerce Clause claim falls on other grounds. Even assuming that the plaintiffs' pre-arranged fares were part of interstate commerce, the plaintiffs have failed to show how either the ordinances or their enforcement unconstitutionally interfere with interstate commerce.[21]

First, the plaintiffs challenge the facial validity of the ordinances. Yet no provision in either of the ordinances prohibits pre-arranged trips to or from points outside of Illinois. Thus, there is nothing inherently wrong with the regulations.

Second, in response to the City's motion for summary judgment, the plaintiffs assert that there have been occasions when pre-arranged fares picked up at O'Hare to be dropped off in another state were interrupted by the arrest of a plaintiff driver. Based on that allegation, the plaintiffs claim that interstate commerce has been impermissibly impeded. Yet, the plaintiffs have provided absolutely no evidence that arrests under such circumstances ever occurred. The exhibits to which the plaintiffs cite, P.Exs. 3, 7 and 18, indicate (1) that the plaintiffs were arrested when they were transporting pre-arranged passengers within the City limits and (2) that, on occasion, certain of the plaintiffs transported pre-arranged passengers out of state. There is nothing in the sworn depositions that even suggests that a correlation exists between the two facts.

Alternatively, in their own motion for summary judgment, the plaintiffs further

---

**20.** "The Congress shall have power ... to regulate Commerce ... among the several states...." U.S. Const. Art. I, § 8, cl. 3. As we noted in *Mustfov I,* although the Commerce Clause may limit the power of states to interfere in areas of national concern, it does not secure rights cognizable under § 1983. Therefore, the

plaintiffs may only seek injunctive relief on this claim. 663 F.Supp. at 1278, n. 17.

**21.** Because the facial claim based on the Commerce Clause is intertwined with the enforcement challenge, we will consider both in this section.

claim that the ordinances deprive pre-arranged fares from completing their interstate travel from other states into Illinois by preventing them from being picked up at O'Hare Field and being dropped of at destinations within the City of Chicago. Here too, however, the plaintiffs have failed to offer any evidence that such a deprivation has ever occurred. Moreover, there is no evidence that suggests that these passengers have had, or would have, any difficulty prearranging fares for destinations within the City with the hundreds of liveries duly licensed by the City for interurban transportation.

Finally, the plaintiffs seem to suggest that the enforcement of these ordinances violates the Interstate Commerce Clause because, while arrested and detained, they are unable to transport out-of-state passengers. Even assuming there have been occasions when a passenger's nonpre-arranged trip out of state has been interrupted because of his driver's arrest under the Anti–Solicitation Ordinance, or even when an out-of-town passenger's pre-arranged trip within the City has been interrupted because of his suburban driver's arrest under the Interurban Operations Ordinance, such interruptions would have been occasioned by the unlawful conduct of the livery operators in accepting these fares against the clear prohibitions of the ordinances. Simply because a driver may be transporting passengers within the stream of interstate commerce does not immunize him from a neutral state law which effectuates a legitimate local public interest and the effects of which on interstate commerce are matched by its benefits. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Accordingly, we grant summary judgment in favor of the City on this claim.

### V. License Claim (Count VI)

The plaintiffs' next claim is a constitutional challenge to the City's right to issue only 520 livery licenses. The plaintiffs have neither moved for summary judgment, nor have they responded in any way to the City's motion for summary judgment on this issue. Thus, whether styled as a substantive due process or equal protection claim, the plaintiffs have failed even minimally to adduce any facts that might suggest that the City has no rational basis for this act of livery regulation. *See Mustfov I*, 663 F.Supp. at 1255. Moreover, by virtue of their failure to respond to the City's Rule 12(m) statement, the plaintiffs have admitted the contrary—namely, that the City has a legitimate interest in regulating liveries, and that it would be impractical for the City to effectively regulate a significantly larger number of liveries than the presently authorized 520. The plaintiffs have further admitted that the City does not distribute the licenses arbitrarily or discriminatorily. Therefore, the City has established a rational basis for the regulation and is entitled to summary judgment in their favor on this claim.

### VI. Sign Claim (Count XII)

The City has also moved for summary judgment on the plaintiff's "Sign Claim." The City maintains, as a service to the public, four boards at O'Hare ("signs") which list various livery companies and their phone numbers. The City places on the signs any bona fide livery company that requests to be listed. The plaintiffs claim that Neb Tarailo's name (or that of his livery company) has been removed from the signs without due process. Although this claim is brought by all of the plaintiffs, we observe that since the alleged removal of only Tarailo's name is at issue, only he has standing to maintain a claim that he has been intentionally deprived of a protectible property interest in the alleged listing. Nevertheless, Tarailo has failed to establish a due process violation.

We first point out that there is no evidence in the record before us showing that Tarailo ever requested having his name placed on the list, that his name actually appeared on the list, or that his name is no longer on the list having been removed. Thus there is no factual basis that the deprivation about which Tarailo complains ever occurred.

Assuming that his name was in fact removed, Tarailo has nevertheless failed to provide any evidence that he possessed a

valid protectible property interest in having his name kept on the list. The signs are offered as a service to the public, not the livery companies. No ordinance or enactment confers the right to be listed on the signs. *Compare Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667 (7th Cir. 1987), *cert. denied*, 485 U.S. 993, 108 S.Ct. 1301, 99 L.Ed.2d 511 (1988) (contractor showed reasonable likelihood of establishing a property interest in minority business certification because the City had already conferred that benefit upon it in accordance with federal law and Executive Order of the Mayor). Thus, at best, all that Tarailo possessed was unilateral expectation that his name would be placed on the list and not removed. Such an expectation does not give rise to a property interest. *See Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

Furthermore, even assuming he did have a property interest in having his name kept on the list, the evidence is unrefuted that the City has never intentionally removed the name of any bona fide livery company.[22] A negligent or erroneous removal of Tarailo's name, even if shown, would not amount to a due process violation. *Daniels v. Williams*, 474 U.S. 327, 330, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). In addition, Tarailo has failed both to avail himself of post-deprivation remedies or to show that his post-deprivation remedies are inadequate. The evidence establishes that a simple phone call from Tarailo to the Department of Aviation ("DOA") would have sufficed to make a complaint about the removal of his name and to ensure reinstatement of the name if it had been improperly removed. There is no evidence that Tarailo has ever contacted the DOA. And there is no evidence supporting the assertion that a more formal process is necessary here. Accordingly, we grant summary judgment in favor of the City on this claim.

## VII. Annexation Claim VIII

■ The plaintiffs next bring a broad based due process assault contending that the City lacks any authority to enact or enforce any of its ordinances in the O'Hare Area on the grounds that the area was not validly annexed by the City. The plaintiffs contend that the original annexation in 1956 of the land on which O'Hare is now located was technically invalid and that the subsequent 1960 annexation of land abutting Foster Avenue did not cure the defects. In response the City advances several reasons either why we should refrain from considering the issue as a matter of comity, or why the plaintiffs should be deemed procedurally barred as a matter of state law from challenging the annexation. Though these arguments are by no means frivolous, we need not address them because we find that summary judgment in favor of the City is appropriate on other grounds.

Even assuming that the City's annexation of the land encompassing O'Hare is invalid as a matter of state law, it is undisputed that the City owns the land on which O'Hare is built. State law provides that:

All property which (1) is owned by a municipality, and (2) lies outside the corporate limits of the municipality, and (3) does not lie within the corporate limits of any municipality, shall be subject to the ordinances, control, and jurisdiction of the municipality in all respects as the property owned by the municipality which lies within the corporate limits thereof.

Ill.Rev.Stat. ch. 24, § 7–4–2. Thus, the City is authorized to regulate and police O'Hare independent of the issue of annexation. And the state statute granting that authority presents no constitutional problem since the state's authority to regulate its political subdivisions is generally within its absolute discretion. *Hunter v. City of Pittsburgh*, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907). *See also Jefferson Twp.*

---

**22.** The plaintiffs' response to the City's motion for summary judgment states: "This listing was removed from the boards intentionally without notice in violation of Neb Jarillo's [sic] due process rights." However, not only does the only evidence on that issue negate that assertion, *see* McCarthy Aff., City Ex. J, ¶ 10, but the statement also directly contradicts the plaintiff's stipulation that the removal was unintentional. J. Fact. No. 6.6.

*v. City of West Carrollton,* 517 F.Supp. 417 (S.D.Ohio 1981), *aff'd,* 718 F.2d 1099 (6th Cir.1983). So long as there is a grant of authority from the state, a municipality's exercise of extraterritorial police powers will be sustained. *See Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978).

## VIII. Enforcement Challenges

### A. *Lack of Authority to Make Arrest and Jail (Count X)*

We now turn to the various enforcement challenges which the plaintiffs have raised based on alleged violations of the plaintiffs' Fourth and Fourteenth Amendment due process rights. The plaintiffs first reiterate a claim we rejected on the motion to dismiss in *Mustfov I* that the police cannot lawfully arrest them for violations of the ordinances and detain them in jail until they post bail. 663 F.Supp. at 1268–69. The plaintiffs have asserted no new allegations concerning this claim. Accordingly, our prior opinion governs this issue.

### B. *Procedural Due Process*

The plaintiffs next raise a procedural due process claim that they are being prohibited in their legitimate business of picking up pre-arranged passengers at the airport due to arbitrary enforcement of the ordinance by city officials. In *Mustfov I,* we determined that the plaintiffs have a property interest at stake when they are effectively prohibited from picking up pre-arranged fares. 663 F.Supp. at 1266. The question we left for resolution on summary judgment is whether the plaintiffs have properly established, or at least have presented a genuine issue of material fact, they are being deprived of that interest by more than negligent conduct by the police. *Id.*

#### 1) *Lack of Probable Cause (Count I)*

 The plaintiffs' first procedural due process claim is that they were intentionally stopped both before they picked up pre-arranged fares and after the fares were loaded, and that they were subsequently arrested and detained without probable cause. The City denies and the plaintiffs have failed to offer evidence specifically that any arrest for violating the Anti–Solicitation Ordinance ever occurred when the trip was pre-arranged. Nor have the plaintiffs offered any evidence that a pre-arranged trip was ever interrupted by an arrest without probable cause on account of an alleged violation of the Inter–Urban Operations Ordinance.

The only evidence at all offered by the plaintiffs on the issue of arrests is an excerpt from the deposition testimony of the plaintiff Mustfov, in which he states that, on at least one occasion after the police had implemented "Operation Hustle" to crack down on suburban livery operations at O'Hare, the police picked him up and arrested him simply on sight, and that he was subsequently detained for twelve hours. Mustfov further stated that the police warned him that the next time they saw him at the airport, they would again arrest him and detain him for another twelve hours.

That evidence, however, fails to establish any facts from which the inference may be drawn that he was arrested incident to a City custom or policy that arrests without probable cause be undertaken as part of "Operation Hustle." Mustfov has offered no evidence of any other incidents of alleged arrests without probable cause. Further, there is no evidence of any other episodes of alleged intentional arrest without probable cause as to any of the remaining plaintiffs. Thus, all that has been presented is an isolated incident, for which the individual officers involved may be liable, but which fails to create an issue of fact upon which the City might be held liable on the ground that Mustfov was intentionally arrested in accordance with a new policy providing for arrests without probable cause. Absent evidence of a policy, there is no basis for damages, and no reason to consider injunctive relief. Therefore, we grant the City's motion for summary judgment on this claim.

#### 2) *Excessive Post–Arrest Detention (Counts VII and X)*

 Two of the individual plaintiffs, Mustfov and Nikolov, next assert that they

have been detained for excessive periods of time in post-arrest processing without just cause and in accordance with a City policy of intentional delay. These plaintiffs do not contest that "a policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of a crime, for a brief period of detention to take administrative steps incident to arrest." *Gerstein v. Pugh,* 420 U.S. 103, 113–14, 95 S.Ct. 854, 862–63, 43 L.Ed.2d 54 (1975). The plaintiffs contend, however, that the reasons and the time for their post-arrest detention went beyond those necessary for administering the arrest.

As we observed in *Mustfov I,* 663 F.Supp. at 1271, the Seventh Circuit has not identified exactly how long the "brief period" for administrative processing may be. Nevertheless, based upon Seventh Circuit precedent discussing the issue, we concluded that "[i]n determining what is a justifiable 'brief period,' we are to decide whether the detention is justified as incident to a legitimate governmental purpose or is imposed for the purpose of punishment." *Id.* Accordingly, we directed the City, on summary judgment, to "present evidence to explain what must be done after these drivers are arrested and why reasonably diligent officers needed [up to] twelve or more hours to do it." *Id. See Gramenos v. Jewel Companies, Inc.,* 797 F.2d 432, 437 (7th Cir.1986), *cert. denied,* 481 U.S. 1028, 107 S.Ct. 1952, 95 L.Ed.2d 525 (1987); *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336 (7th Cir.1985).

We first mention the evidence presented by the plaintiffs on the issue of unreasonable detention. Regarding the time periods of detention, there is evidence that the plaintiff Mustfov had been held in post-arrest detention for periods of time ranging from as much as four to twelve hours, and that his average period of detention was three to four hours. It has been stipulated that the plaintiff Nikolov has spent an average of four hours in detention. On the issue of reasonableness, there is testimony from city police officers that, as part of "Operation Hustle" and a new "get tough" policy against the livery drivers, the City wanted to detain livery drivers as long as possible after arrest to prevent them from going back out on the street. There is further evidence that another livery driver, Mendoza, was warned that if he elected to exercise privilege of phone call, he would be detained an additional three hours and would be subject to additional processing, thus suggestive of City practices regarding detention. Moreover, one of the police officers, Joseph DeFranco, testified that there was a directive from his superiors to take fingerprints on each and every arrest of livery violators. Another officer, George Andikokus, indicated that it would then take anywhere from four to twelve hours or more for fingerprint clearance. There is also evidence that the police knew that the plaintiffs had been complaining concerning the length of detention.[23]

In response to all of this evidence, the City has failed to follow our direction in *Mustfov I* to provide an explanation why detention periods of up to twelve hours may have been necessary in Mustfov's case and why average detention periods of up to four hours for both plaintiffs were necessary. Instead, the City mistakenly contends that it cannot be liable as a municipality for these detentions. The City ignores the fact that the plaintiffs have asserted that a City custom and policy of unreasonable and excessive detention was involved, and that the plaintiffs have raised

---

**23.** The plaintiffs also claim that intentional and arbitrary conduct of the City is indicated by the existence of a policy whereby the City police treated the plaintiffs differently than other misdemeanor offenders at O'Hare with respect to the issuance of I–Bonds for their release from custody. The plaintiffs claim that total discretion was given to watch commanders to issue I–Bonds for the plaintiffs or not to issue them, as opposed to a policy where those committing more serious offenses such as purse snatching, theft, and the like, were routinely released on I–Bonds. Two of the exhibits (P.Ex. 3 & 20) cited by the plaintiffs, however, do not present any evidence regarding the practice of issuing I–Bonds to other misdemeanor offenders at O'Hare. The remaining exhibit upon which they rely (P.Ex. 19) was not included with their submissions.

at least an issue of fact regarding the existence of such a custom or policy.[24]

The City also asserts that summary judgment in its favor is appropriate on this claim because on average, the lengths of detention for Mustfov and Nikolov were only three to four hours. However, nowhere has it been stipulated that an average detention period of four hours is per se reasonable and four hours is a period of time that the Seventh Circuit has plainly indicated deserves an explanation. *See Gramenos,* 797 F.2d at 437 (reversing summary judgment in favor of police, finding that a four hour detention in the dead of night required an explanation from the police justifying such a detention); *Moore,* 754 F.2d 1336 (also requiring an explanation for a four hour detention). Indeed, the evidence that the plaintiffs were detained on average up to four hours suggests that on occasions the detention periods must have lasted greater than four hours. We further observe that, in light of evidence that post-arrest processing prior to "Operation Hustle" took only 15–20 minutes, the fact that later processing took an average of four hours does not weigh in the City's favor. Moreover, a question arises as to the necessity of fingerprinting the plaintiffs after every arrest, since it is undisputed that these plaintiffs were arrested on hundreds of occasions and that the officers enforcing the ordinances were quite familiar with the plaintiffs.

Though we see no inherent problem with a crackdown of enforcement of the ordinances, there exists a genuine issue of fact whether the City legitimately employed its battery of post-arrest procedures or whether it engaged in an abuse of process based on a policy that encouraged the arbitrary exercise of the discretionary authority of its police officers in order to punish the plaintiffs with process. Accordingly, both the City's and the plaintiffs' motions for summary judgment as to this claim are denied.

■ The corporate plaintiffs, Ace and Adventure, have also asserted Fourth Amendment claims based on the detention of their "employees." However, not only do Ace and Adventure fail to have any Fourth Amendment standing to sue for the unreasonable detention of others, they have severed any relationship to the individual plaintiffs by asserting that their drivers are independent contractors, not employees. Accordingly, we enter summary judgment against them and in favor of the City on this claim.

## C. *Differing Arrest Policies (Count V)*

Finally, we turn to the plaintiffs' equal protection challenge regarding the City's alleged practice of disparate enforcement of the ordinance at Midway and O'Hare airports. This claim fails on summary judgment for three reasons. First, the record is bereft of any competent evidence that such a policy of disparate enforcement of the ordinances at the two airports even exists. Indeed, based upon the admissions and stipulations, the facts are uncontested that the City's arrest policy is the same at both airports: arrest and transportation to the nearest district station.

Second, it appears on the facts before us that this claim does not properly come within the ambit of the Equal Protection Clause because there is no evidence that a particular group has been singled out for disparate treatment. From what we can discern from the scant record on this issue, all livery drivers are affected by the alleged disparate treatment the same way; there is no distinct group of Midway livery operators versus O'Hare livery operators. Thus, this claim does not present a case of similarly situated individuals being treated differently, and therefore more appropriately falls with the ambit of the Due Process Clause as yet another assertion of arbitrary enforcement.

Third, whether covered by the Equal Protection or the Due Process Clause, if there is a rational basis in this case for the

---

**24.** Since the plaintiffs have sued only the City and two of its officers in their official capacities, their Section 1983 action survives only to the extent they can establish such a custom or policy.

**300**

alleged disparity in the enforcement of the ordinances at the two airports then the measures will be sustained. *Mustfov I,* 663 F.Supp. at 1263. The only disparity in treatment of violators at Midway and O'Hare is that an arrest and subsequent processing may take longer at O'Hare than at Midway. The City has adequately shown, without contest by the plaintiffs, that rational reasons exist for this difference in processing time—the size of the airports, the numbers of violators at each, the amount of traffic, the geographic location, and the location of police facilities. Accordingly, we grant the City's motion for summary judgment on this issue.

### CONCLUSION

We grant summary judgment in favor of the City and against the plaintiffs on all of the remaining claims except one. We find that an issue of fact exists, sufficient to preclude summary judgment for either side on the claim for damages, based on evidence that the plaintiffs Mustfov and Nikolov may have been intentionally subjected to excessive post-arrest detention periods on numerous occasions, in accordance with a City custom or policy. It is so ordered.