TMT NORTH AMERICA, INC.,
Plaintiff–Counterdefendant,

v.

THE MAGIC TOUCH GMBH,
Defendant–Counterclaimant.

The Magic Touch GmbH, Third–
Party Plaintiff,

v.

Robert Kaminsky and Marc Langs,
Third–Party Defendants.

No. 96 C 4502.

United States District Court,
N.D. Illinois,
Eastern Division.

July 22, 1999.

Marvin N. Benn, Dawn Marie Cassie, George W. Hamman, Jeanne Marie Hoffman, Hamman & Benn, Chicago, IL, for TMT North America, Inc.

Glenn F. Ostrager, Dennis M. Flaherty, Joshua S. Broitman, Ostrager, Chong & Flaherty, New York City, for TheMagic-Touch, GMBH.

Jerome Gilson, Brinks, Hofer, Gilson & Lione, Chicago, IL, for Jerome Gilson, special master.

## MEMORANDUM OPINION AND ORDER

LEVIN, United States Magistrate Judge.

At issue before the court is The Magic Touch GmbH's ("TMT–GmbH") ("Movant") Motion for an Order to Show Cause and for an Order of Contempt and Sanctions, as against Third–Party Defendant Robert Kaminsky ("Kaminsky") ("Respondent") et. al.[1]

## FACTUAL BACKGROUND

This case arose as a result of a dispute between TMT–GmbH, a global distributor of TheMagicTouch brand image transfer paper, and TMT North America, Inc. d/b/a Visual Communications ("TMT–NA"), TMT–GmbH's former U.S. distributor, over ownership of certain trademarks. TMT–GmbH is a German company that has developed a specially-coated paper for use in transferring images onto fabrics. Color photocopiers transfer images onto paper and by using heat and pressure, the images can then be transferred onto various fabrics.

In 1990, TMT–GmbH entered into an agreement with TMT–NA, making TMT–NA the exclusive North American distributor of TMT–GmbH's image transfer products. The distribution agreement stated in part, that TMT–NA was required to display TMT–GmbH's trademark and instructions, as supplied by TMT–GmbH, on all promotional and other materials produced by TMT–NA in the manner agreed upon by both parties prior to production. In February 1993, TMT–NA filed a federal trademark application for "TheMagic-Touch," which was granted in 1994. In April 1993, TMT–GmbH filed its own federal trademark application, which was unsuccessful[2]. Nevertheless, TMT–GmbH and TMT–NA continued their distribution relationship without a written contract until June 1996 when TMT–NA terminated its distributorship and filed suit against TMT–GmbH. Following the termination of TMT–NA's distributorship, TMT–NA obtained an alternate source of image transfer paper and allegedly marketed that paper under the TheMagicTouch

---

1. The parties agreed in open court that the instant motion is resolvable on the memorandums of law and supporting papers submitted to the court. Upon review, this court agrees.

2. A change in ownership in TMT–NA in late 1992 resulted in a breakdown of the relationship between TMT–NA and TMT–GmbH. Prior to the time that TMT–NA filed its trademark application, TMT–GmbH and TMT–NA were unable to negotiate a new distributorship agreement.

brand name. According to Defendant TMT–GmbH, TMT–NA misused TMT–GmbH's trademarks and misled the public into believing that TMT–NA's paper was still TheMagicTouch paper. TMT–NA's alleged sale of counterfeit goods under TMT–GmbH's trademark was the cause of irreparable damage to TMT–GmbH's goodwill and reputation.

In short, this litigation was settled on December 9, 1997. The parties entered into a Stipulation and Order of Dismissal of Prejudice before this court, along with a simultaneously executed written Settlement Agreement referred to in the dismissal order.[3] Pursuant to the settlement agreement signed by the parties, TMT–GmbH released its claims of trademark infringement, unfair competition, misappropriation of trade secrets and a potential future claim for patent infringement. In return, TMT–NA forfeited claims that it had ownership rights to TMT–GmbH's trademarks and executed certain settlement consideration(s) subject to confidentiality restrictions. TMT–NA was given the right to sell or otherwise dispose of the Inventory[4] no later than December 31, 1997 so long as the packaging did not include reference to the Trademarks and included a notice enclosed with or affixed to the product.

A pertinent provision of the Order of Dismissal ("Order"), insofar as it relates to this motion, is that the "TMT–NA Parties," which included TMT–NA d/b/a Visual Communications, Marc Langs and Robert Kaminsky[5], were enjoined from using TheMagicTouch trademark. Paragraph 4 states in part:

The TMT–NA Parties, and each of them, and each of their officers, agents, servants and employees, and all those in active concert or participation with them, effective the date of this Order, shall not hereafter use the Trademarks, or any mark similar thereto or likely to cause confusion therewith, including without limitation in connection with the sale, offering for sale, distribution or advertising of any transfer paper, related accessory product, or similar merchandise and services. . . .

Paragraph 6 states:

Notwithstanding paragraph "4" herein, the TMT–NA Parties shall have the right to sell or otherwise dispose of the Inventory, as identified in the Settlement Agreement, provided such disposition is completed no later than December 31, 1997, and provided further that the packaging for such paper does not include reference to the Trademarks, and a notice is enclosed with the product or affixed to the product packaging which states: "TMT North America, Inc. (now Visual Communications) is not affiliated with or a distributor of transfer paper manufactured by TheMagicTouch GmbH, Maintal, Germany. The transfer paper in this package was manufactured by Visual Communications and is not manufactured by TheMagicTouch GmbH." It is further agreed that TMT–NA's customers and distributors shall have the right in the United States to sell off goods bearing the Trademarks purchased from TMT–NA prior to December 31, 1997.

TMT–GmbH, alleges, *inter alia*, that Robert Kaminsky offered for sale, sold and exported transfer paper bearing TheMagicTouch trademark to a German company, A & H Vertriebs, in violation of the Order.

---

3. The parties had consented to the jurisdiction of this court under applicable federal law. Under the stipulation and dismissal order, this court retained jurisdiction of controversies arising out of the order and the accompanying settlement agreement.

4. The "Inventory" was defined in the Settlement Agreement as TMT–NA's inventory of image transfer paper bearing the imprint TheMagicTouch The "Inventory" was further defined as several hundred thousand sheets of this image transfer paper.

5. Robert Kaminsky is one of the third-party defendants in this cause and allegedly one of the principals in Plaintiff TMT–NA k/n/a Visual Communications.

It is movant's belief that sometime after December 9, 1997, the date of the Order of Dismissal, Sam Kendes and Robert Kaminsky incorporated Powerful Papers, Inc., which then purchased some or all of the assets of TMT–NA and began doing business as Visual Communications. QLT purchased inventory from TMT–NA in accordance with the Order, but there are questions raised by movant surrounding QLT's connection with Visual Communications, in regards to the sale of certain "Inventory" after the date set forth in the Order.[6]

### ANALYSIS

TMT–GmbH, through its Motion for Contempt and Sanctions has essentially asked this court to grant the following relief: (1) an order requiring third party defendant Robert Kaminsky and non-parties to the underlying cause, Powerful Papers, Inc. d/b/a Visual Communications, QLT Imprint Supplies, Inc., Sam Kendes and Raul Feliciano (collectively "Contempt Defendants") to appear at a hearing and show cause as to why they should not be found in civil contempt; (2) an order finding Contempt Defendants in civil contempt; (3) an order, consequential to the contempt, granting sanctions including all profits earned as a result of the contumacious sales, recall of the product sold in violation of the Order of Dismissal, destruction of all product bearing THE MAGIC TOUCH trademark, costs incurred for corrective advertising and attorney's fees; and (4) an order granting an accounting of profits earned as a result of the contumacious sales.

### I. Standard of Review

■ Civil contempt proceedings arise under 18 U.S.C. § 401(3), which states in pertinent part: "A court of the United States shall have the power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as ... [d]isobedience or resistence to its lawful writ, process, order, rule, decree, or command." "Before a court may invoke the statute, however, it must be able to cite a decree which 'sets forth in specific detail an unequivocal command' violated by the party in contempt." *McGuffin v. Springfield Housing Authority*, 662 F.Supp. 1546, 1548 (C.D.Ill.1987) (*quoting Ferrell v. Pierce*, 785 F.2d 1372, 1378 (7th Cir.1986), *citing H.K. Porter Co. v. National Friction Products*, 568 F.2d 24, 27 (7th Cir.1977)).

■ "The purpose of a civil contempt proceeding is either enforcement of a prior court order or compensation for losses suffered as a result of non-compliance with that order." *Miller v. LeSea Broadcasting, Inc.*, 927 F.Supp. 1148, 1149–50 (E.D.Wis.1996); *See Commodity Futures Trading Commission v. Premex, Inc.*, 655 F.2d 779, 785 (7th Cir.1981). To hold a party in contempt, the court must be able to point to an order which sets forth a clearly articulated command which the alleged party in contempt has violated. *Miller*, 927 F.Supp. at 1150; *See Stotler & Company v. Able*, 870 F.2d 1158, 1163 (7th Cir.1989).

■ "A complaining party must prove that the order was violated by 'clear and convincing' evidence." *Able*, 870 F.2d at 1163; *See, e.g., United States v. Huebner*, 752 F.2d 1235, 1241 (7th Cir.), *cert. denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 50 (1985). A party may be found to be in contempt if such party was not reasonably diligent in attempting to accomplish what was ordered. *American Fletcher Mortgage Co. v. Bass*, 688 F.2d 513, 517 (7th Cir.1982) (citation omitted).

---

6. Movant contends that QLT and Visual Communications operate out of the same office in New York City. Furthermore, movant asserts that Kaminsky and Kendes are executive officers with ownership interests in Powerful Papers, while Kendes is also the owner of QLT.

The close connection between Kendes and Kaminsky and the transactions between QLT and Visual Communications have lead movant to its conclusion that Respondent is in violation of the Order.

Federal Rule of Civil Procedure 65(d) governs the court's power to bind persons to an injunction or order and states in pertinent part:

Every order granting injunction and every restraining order ... is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those parties in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

"Nonparties are liable for contempt on an injunction if, with notice of the injunction, the nonparty aids or abets the enjoined party in the violation of the injunction or if the nonparty is a successor in interest to the property subject to the litigation." *Hexacomb Corp. v. GTW Enterprises, Inc.*, 1994 WL 171533, *4 (N.D.Ill.1994); *See also Panther Pumps & Equip. Co. v. Hydrocraft, Inc.*, 566 F.2d 8, 12 (7th Cir.1977), *cert. denied*, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978) (citations omitted). As the court in *Chanel Industries, Inc. v. Pierre Marche, Inc.*, 199 F.Supp. 748, 753 (E.D.Mo.1961) stated:

The injunction of the Court is binding upon the parties-defendant and those in privity with them so that defendants may not nullify a decree by carrying out prohibitive acts through aiders and abettors although they were not parties to the *original proceeding....* Courts have repeatedly held that if a person has actual knowledge of an injunction he may be amenable to it even where not a party to the suit and was not served with a copy of the injunction.

## II. TMT–NA's Sale of Inventory

The central issue in this case surrounds the sale of certain "Inventory," the transaction of which was consummated after the Stipulation and Order was entered into by the parties. Paragraph 6 of the Order states:

Notwithstanding paragraph "4" herein, the TMT–NA Parties shall have the right to sell or otherwise dispose of the Inventory, as identified in the Settlement Agreement, provided such disposition is completed no later than December 31, 1997, and provided further that the packaging for such paper does not include reference to the Trademarks, and a notice is enclosed with the product or affixed to the product packaging which states: "TMT North America, Inc. (now Visual Communications) is not affiliated with or a distributor of transfer paper manufactured by TheMagicTouch GmbH, Maintal, Germany. The transfer paper in this package was manufactured by Visual Communications and is not manufactured by TheMagicTouch GmbH." It is further agreed that TMT–NA's customers and distributors shall have the right in the United States to sell off goods bearing the Trademarks purchased from TMT–NA prior to December 31, 1997.

According to movant, Robert Kaminsky sold TheMagicTouch brand transfer paper after December 31, 1997 in violation of the Order. Movant avers that Robert Kaminsky, co-owner of Visual Communications (along with Sam Kendes) negotiated with Hans Heveling, a partner in A & H Vestriebs, for the purchase of TheMagicTouch transfer paper in March 1998 at a trade show in Europe. Movant relies on the statement of Simone Weidensee–Bahr, a partner of Hans Heveling in the firm of S & W Gbr.[7] According to Weidensee–Bahr, Heveling persuaded Ali Asisi, his partner in A & H Vestriebs, Gudrun Schramowski and herself to invest in a new company to be named S & W, which was to serve as the exclusive distributor for Visual Communications. On May 26 and 27, 1998, Heveling allegedly went to New York and met with Kaminsky. (*See* Weidensee–Bahr Decl., ¶ 4.) One purpose of this alleged meeting was to finalize the terms of an exclusive distri-

---

7. Heveling died in October, 1998.

bution agreement between Visual Communications and A & H Vestriebs. At that time, Heveling placed his first and only order for transfer paper and paid Kaminsky $5,800.[8] (*See* Weidensee–Bahr Decl., ¶ 4.)

On June 1, 1998, Kaminsky faxed a letter to Heveling, confirming that A & H Vestriebs had Visual Communications' permission to distribute Mirror Image Transfer Papers within Germany. (*See* Weidensee–Bahr Decl., Exh. 1.) Movant has attached two invoices which identify Visual Communications and QLT as the sellers and indicate a sale of 100 boxes of SS 500 Mirror Image transfer paper and 315 boxes of "the magic touch transfer paper" to A & H Vestriebs respectively. (*See* Weidensee–Bahr Decl., Exh. 3, 4.) Movant argues that although the paperwork identified two sellers, all of the paper had been sold as a result of the negotiations between Heveling and Kaminsky and was sent from New York to Germany in one shipment by QLT under one air waybill.[9] Movant further alleges that the two lots of transfer paper were part of the same transaction and the paperwork was arranged in such a way so as to disguise

Kaminsky's involvement in the sale of paper bearing TheMagicTouch trademark.

Respondent Kaminsky's sworn testimony was that sometime in mid–1998, he met with Heveling, but at that meeting, Kaminsky merely introduced Heveling to Russ Gold and Patty Barrett of QLT. Kaminsky has no legal affiliation with QLT. (*See* Kaminsky Decl., ¶ 8.) Kaminsky never represented that he was acting on behalf of QLT. Kaminsky states that Heveling negotiated directly with Gold and Barrett of QLT for the purchase of the image transfer paper. QLT not Visual Communications was paid for the paper as reflected by at least one of the subject invoices being from QLT. Put otherwise, respondent points out that Visual Communications was not paid for the paper that Heveling purchased from QLT.

Given this state of the evidence, the court finds that movant has not shown by clear and convincing evidence a violation of paragraph 6 of the subject order.[10]

On or about October 5, 1998, Juergen Hagedorn, TMT–GmbH's International Marketing Manager, learned of the above described sales. (*See* Hagerdorn Decl.,

**8.** No evidence was presented to corroborate this statement, which, as will be discussed, is directly contradicted by Respondent's evidence. Too, an invoice from QLT to Heveling shows that Heveling paid $2,200 in cash to QLT. (*See* Weidensee–Bahr Decl., Ex. 4.)

**9.** Both QLT and Visual Communications have offices located at 95 Morton Street, New York, NY. QLT is located on the 5th floor, while Visual Communications is located on the 6th floor.

**10.** Also, movant points to the deposition testimony of Kaminsky himself, in which he stated that he had *not* introduced Heveling to any member of the QLT staff. Given the state of the evidence, as recited above, however, this credibility inconsistency, in and of itself, is insufficient to meet movant's burden to show by clear and convincing evidence that the subsequent sale of inventory by Visual Communications was a violation of the Order.

Movant also argues that Heveling was brought down to QLT's offices and introduced

to Michael Kaminsky, Robert's brother, who purportedly took the order on behalf of QLT. (*See* Broitman Decl., Ex. 2, p. 19; Ex. 4, pp. 14, 20.) Movant would have the court find Robert Kaminsky in contempt of the Order because his brother Michael is an employee of Visual Communications. Generally, an injunction may be thwarted by the conduct of parties not specifically named therein. "The scope of an injunction has no rigid perimeter, and a court may modify an injunction to adapt to changed circumstances." *Rockwell Graphic Systems, Inc. v. DEV Industries, Inc.*, 91 F.3d 914, 919 (7th Cir.1996). "A court must consider the extent of the alleged 'active concert or participation' of third parties with those named in the injunction in determining whether the injunction's prohibitions shall apply to those third parties." *Id.* The fact that Heveling was introduced to Michael Kaminsky, a Visual Communications employee, even with movant's other evidence, does not prove by clear and convincing evidence, that Robert Kaminsky was in contempt of the Order. As such, movant is unable to satisfy its burden as to this argument.

¶ 4.) Shortly thereafter, Hagerdorn sent a letter to Heveling, notifying him of TMT–GmbH's trademark and patent rights in the transfer paper. (*See* Hagerdorn Decl., ¶ 5.) According to Hagerdorn, via hearsay herein, Heveling allegedly informed Hagerdorn that he had dealt with Robert Kaminsky, who was with Visual Communications. (*See* Hagerdorn Decl., ¶ 6.) Respondent points out that the Hagerdorn declaration does *not* state that Heveling dealt *exclusively* with Kaminsky, nor does it state that Heveling told Hagerdorn that he had never heard of Sam Kendes, QLT's president. Respondent cites to Exhibits 4 and 12 of the Weidensee–Bahr Declaration to show that Heveling was familiar with QLT because he received an invoice from QLT and because Heveling refers to QLT in his correspondence to Visual Communications. The court finds that the generalized hearsay declaration of Heveling relied on by movant, given the state of the evidentiary record including Kaminsky's explanation(s) recited above, does not alter that the clear and convincing evidentiary standard has not been established herein.

It is also movant's position that Kaminsky's personal involvement in the sale of transfer paper to Heveling's company, which was facilitated by Raul Feliciano, was in violation of the Order of Dismissal. It is also movant's contention that QLT and its President, Sam Kendes, non-parties to the underlying cause herein, acted in concert with Kaminsky by allowing the contumacious sale to be invoiced to QLT. In other words, movant argues that even if QLT made the sale, Kendes and QLT violated the injunction because Kendes had subsequently become a partner with Kaminsky in the new business of Visual Communications. Movant relies on the depositions of Kaminsky, Kendes and Feliciano to establish that QLT and Visual Communications purchase supplies jointly, ship

product jointly, share warehouse space and have free access to each other's premises on the fifth and sixth floors at 95 Morton Street in New York City. Movant argues that this joint commercial activity constitutes "action in concert" to circumvent the Order and provides a basis for imposing sanctions on Visual Communications, Kaminsky, QLT and Kendes. To the contrary, "the business association between two individuals, standing alone, is [not] a sufficient ground for holding one in contempt for acts committed by another." *Max's Seafood Cafe v. Quniteros,* 176 F.3d 669, 50 U.S.P.Q.2d 1665, 1668 (3d Cir. 1999). The fact that QLT and Visual Communications occupy office space in the same building, ship products jointly and purchase supplies jointly does not, by itself, prove, by clear and convincing evidence, that QLT and its President, Sam Kendes, acted in concert with Kaminsky by allowing the contumacious sale to be invoiced to QLT.

█ Visual Communications sold its remaining inventory to QLT in New York on December 17, 1997 and again on December 29, 1997. (*See* Kaminsky Decl., ¶¶ 2, 4, 5 and Exh. 1.) Kaminsky/Visual Communications relate, however, that the transaction was proper in that QLT paid fair value for the inventory, QLT was in business for 25 years, was a customer of TMT–NA since 1992 and is not a sham business, affiliated with or under the control of Kaminsky. Rather, QLT is owned by Sam Kendes and according to respondent, he (Kaminsky) has never held any ownership interest, or interest of any kind in QLT, nor has QLT owned any interest in Visual Communications. (*See* Kaminsky Decl., ¶ 8.) Thus, it is respondent's position that movant has not met its burden of establishing by clear and convincing evidence that QLT is somehow a sham business or was under Kaminsky's control. This court agrees.[11]

11. It bears noting that respondent argues that the statements in the Weidensee–Bahr and Hagerdorn declarations based upon what Heveling told Weidensee–Bahr and Hagerdorn are hearsay and therefore inadmissible. Respondent cites to several cases in support of its argument that such statements are inadmissible. However, the court disagrees. The

In conclusion, to reiterate, in light of the evidence before the court, the court finds that movant, TMT–GmbH, has not been able to establish by clear and convincing evidence its case on the sale of inventory issue. As one example, Robert Kaminsky's sworn contention that he merely introduced Heveling to QLT employees is in direct conflict with Weidensee–Bahr's and Hagerdorn's hearsay declarations; and the documents attached to Weidensee–Bahr's declaration do not show, by clear and convincing evidence, a violation of the Order in the form of selling TheMagicTouch paper.[12] Assessing the evidence on the issue, this court cannot conclude that the clear and convincing evidentiary burden has been met. Therefore, TMT–GmbH's Motion, based on TMT–NA's sale of the inventory, is unavailing.

## II. Affixation Of Labels To Product Packaging

Paragraph six of the Order required TMT–NA to enclose a notice with or affix a notice to any Inventory it sold prior to December 31, 1997[13]. Movant argues that Respondent is in contempt for failure to affix such court-ordered notice to certain product packaging.

Movant relies on the deposition of Robert Kaminsky, in which Kaminsky stated that he never inspected the paper inventory to confirm that "all" boxes had been properly labeled. (*See* Broitman Decl., Ex. 2, p. 30–34.) An enjoined party who fails to be "reasonably diligent and energetic in attempting to accomplish what was ordered," fails to ensure proper and effective compliance and is in contempt. *Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 12 USPQ2d 1368, 1371 (2d Cir.1989), *cert. denied*, 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990). In this case, however, Kamisnky's deposition testimony evidences that a reasonably diligent and energetic attempt to comply with the Order was made. Kaminsky testified that he made four trips to QLT in December 1997 and January 1998, during which he stickered "what was ever unsealed. In other words, if I opened up a master skid, I would sticker everything on the skid." (*See* Broitman Decl., Ex. 2, p. 31.) While Kaminsky admits that he did not personally check to make sure that TheMagicTouch paper enclosed as part of the shipment to Heveling had the required labels, his actions were nevertheless reasonably diligent and energetic to comply with the order. He made four separate trips to affix the labels, a process which

disputed hearsay declarations are admissible in support of TMT–GmbH's Motion for Contempt. Generally, in *summary judgment* proceedings, deposition testimony that is not based on personal knowledge is inadmissible to create a genuine issue of material fact. *See Mustfov v. Superintendent of Chicago Police Dept.*, 733 F.Supp. 283, 287 (N.D.Ill.1990). However, as the court stated in *Central States, Southeast and Southwest Areas Pension Fund v. Transcon Lines*, 1993 WL 116752, \*3 (N.D.Ill.1993):

The objective of the pleadings in a proceeding for civil contempt is to permit plaintiffs to present their case, give defendants notice and opportunity to be heard and make sure that any special procedural protections applicable to contempt proceedings are observed.... Local Civil Rule 18(A) provides that the affidavit 'shall set out with particularity the misconduct complained of, the claim, if any, for damages occasioned thereby, and such evidence as to the amount of damages as may be available to the moving party.' The rule contains no requirement that evidence attested to in the affidavit be admissible at trial.

**12.** Respondent's response gives an explanation for each document attached to the Weidenese–Bahr declaration, intended to show that the documents do not show a violation of the Order. The reply brief does not reply to the arguments made by Respondent regarding these exhibits.

**13.** A label with the following language was required: "TMT North America, Inc. (now Visual Communications) is not affiliated with or a distributor of transfer paper manufactured by TheMagicTouch GmbH, Maintal, Germany. The transfer paper in this package was manufactured by Visual Communications and is not manufactured by TheMagicTouch GmbH."

**594**

involved removing the shrink wrap from the boxes and then breaking down the master cartons and applying the stickers, a process which took some four to eight hours per trip.[14]

While movant avers that it has multiple boxes taken from the QLT shipment to A & H Vestriebs (none of which have labels covering TheMagicTouch name), based on Respondent's energetic and reasonable diligence evidence, it cannot be said, applying the clear and convincing evidence standard, that the Respondent is in contempt for failure to affix labels in accordance with the subject Order. Therefore, TMT–GmbH's Motion on this issue is also unavailing.

### III. Sanctions

TMT–GmbH argues that this court impose various sanctions against the alleged parties in "contempt".[15] However, as the necessary threshold contempt has been determined not to be present under applicable standards (as discussed above), the Motion for Sanctions, accordingly, must fall.

### CONCLUSION

In view of the foregoing, the court declines to certify the facts of the matter to the District Judge pursuant to 28 U.S.C. § 636(e) or to issue a rule to show cause, and accordingly, the Motion by defendant for an Order to Show Cause and for an Order of Contempt, Sanctions, etc. is denied.

---

**14.** Movant also seeks to rely on certain deposition testimony of Kathy Hopkins. That testimony, however, is immaterial in light of Kaminsky's recited testimony.

**15.** The defendant's Motion for Expedited Discovery under the instant motion before the court was previously granted.